**Wayne Desmond HARRIS**

v.

**Duane K. FRIEDLINE, et al.**

**Civ. A. No. 83–0640–R.**

United States District Court,
E.D. Virginia,
Richmond Division.

Dec. 22, 1983.

S.W. Tucker, Hill, Tucker & Marsh, Richmond, Va., for plaintiff.

Steven L. Micas, County Atty., Jeffrey L. Mincks, Asst. County Atty., Chesterfield, Va., for defendants.

## OPINION

WARRINER, District Judge.

This action was filed on 20 October 1983. Essentially plaintiff alleges a claim in the nature of false imprisonment when he was charged, arrested and held in jail pending a preliminary hearing on rape, burglary, and robbery. To this common law claim asserted under 42 U.S.C. § 1983 plaintiff appends an assertion that he is a black person and the victim of the rape was a white person. He alleges, without elaboration, that "[t]he willingness of the defendants to effect, tolerate, and continue the false imprisonment" was based upon the racial circumstance.

Named as a defendant was the police officer, Friedline, who investigated the crime, swore out the arrest warrant, and executed the warrant for the arrest of plaintiff. Also named a defendant is the Chesterfield County Chief of Police, Pittman. Next plaintiff names as a defendant the Sheriff of Chesterfield County, Wingo, who, pursuant to orders issued by appropriate judicial officers, confined plaintiff in the Chesterfield County Jail. Next, plaintiff named as a defendant an Assistant Commonwealth's Attorney, Shaffer, who argued before the Court on a bail reduction motion that the bail should not be reduced. Plaintiff also named Shaffer's superior, the Commonwealth Attorney for the County of Chesterfield, Watson.

On 5 December the defendants filed their several motions for summary judgment adequately supported by briefs, affidavits, and exhibits.[1] Plaintiff has failed to respond within the time required by Local Rule 11(F). The Court will consider the motions on the present state of the record.

Defendants adequately summarized the factual basis for their several motions and in setting forth the undisputed facts I will largely paraphrase defendants' briefs.

It is undisputed that Mrs. Emily Coleman, age 73, was asleep on the sofa in her daughter's home on Hickory Road in Chesterfield County between 4:00 and 4:30 a.m. on 8 August 1982. She awoke to find a person pressing down upon her as she lay on the sofa. He put a knife to her throat

---

1. A single comprehensive brief, instead of several identical briefs with variations, and a single set of exhibits would have been preferable.

and told her he would kill her if she did not submit to him. For the next 30 to 40 minutes he proceeded to rape her. Following this bestial act, he placed a cover over Mrs. Coleman's face and warned her that if she looked out from under the cover he would kill her. He robbed her of a gold necklace around her neck and stole some other articles in the room. While he was doing this Mrs. Coleman, with great pluck, looked out from under the cover and observed her assailant.

When he left, the county police were immediately contacted. The assailant was described as a black male approximately six feet tall, young, and wearing a white shirt open at the collar. The police responded immediately and spotted an automobile in the neighborhood containing as a passenger a black male generally meeting the description. When the officer turned on his light the automobile sped off, ran a stop light without slowing, turned in a residential driveway, and finally stopped at the rear of the dwelling. The officer followed and there encountered plaintiff. While plaintiff was not wearing a white shirt open at the collar, he was wearing a white jacket open at the collar. It gave the appearance of being a shirt.

At the officer's request plaintiff consented to go to the police station for examination to obtain evidence which might inculpate him or exculpate him in the burglary, rape, and robbery. At the police station plaintiff permitted the taking of an oral swab, pubic hair combings and other such types of material. He also consented to take a lie detector test but before that could be set up he stated that he wanted to go home. He was thereupon taken home. He and the driver of the car later did take lie detector tests. The driver of the automobile gave indications that he was lying when he said that he had been with plaintiff during the relevant period. Plaintiff gave indications that he was lying when he denied his participation in the crimes.

Plaintiff was photographed at the station house. His photograph was set in a photographic array containing the photographs of six other persons similar in appearance. This array was taken to Mrs. Coleman later in the day and she identified plaintiff's photograph as being that of her assailant. Officer Friedline then appeared before a magistrate and swore to the facts known to him at the time. On that basis the magistrate issued a warrant for plaintiff's arrest. He was arrested the same day. The next morning plaintiff was taken before a magistrate, informed of the charges against him, and a bond was set.

Material taken from plaintiff at the station house and material taken from the scene of the rape were sent to the State forensic unit for evaluation. A hearing was set for 29 September before the General District Court for a determination as to whether probable cause existed to bind plaintiff over to the grand jury. In the meantime, counsel was appointed to represent plaintiff and plaintiff was lodged in the Chesterfield County jail.

On motions for a reduction in bond and on motions for continuances, plaintiff was removed from the jail and taken before a judicial officer on 9 August, 29 September, 1 October, 3 November, 10 November, and 15 November. The continuances were occasioned by delay in obtaining a report from the forensic unit and as a result of the incapacity of Mrs. Coleman to appear and testify. Mrs. Coleman experienced a rapid deterioration in her health following the rape. She suffered from chronic kidney poisoning requiring continuous ambulatory peritoneal dialysis. In addition she suffered from hypertension and diabetes, intermittent episodes of fainting, moderately severe anemia, and depression. Her medical condition was reported by her treating physician as being "quite serious."

In light of plaintiff's inability to make even the modest bond set and in view of Mrs. Coleman's inability to appear, on 15 November plaintiff was released on his personal recognizance.

Mrs. Coleman had been removed to Pensacola, Florida, but at the expense of the Commonwealth she was flown to Chesterfield, along with her daughter, for the con-

tinued preliminary hearing set for 1 December. On direct examination at the hearing Mrs. Coleman pointed out plaintiff as the man who had raped and robbed her. Later she became confused and on cross-examination she was unable to describe her attacker and she stated she was "not sure" whether it was Harris. Mistakenly or not, the general district court judge determined there was not probable cause to send the matter on to the grand jury. He dismissed the charges. Apparently the Commonwealth's Attorney has not chosen to present the matter to the grand jury on his own authority.

■ One has to almost catch his breath upon realizing that upon the above undisputed facts, plaintiff seeks damages against the defendants in the sum of $100,-000. One would think he would be ashamed to file suit in the face of facts replete with constitutional, statutory, and common law regularity, order, and process. The most that plaintiff can claim, under these facts, is that he was subject to misidentification. Nothing in the Constitution protects us from this manifestation of human frailty. See *Baker v. McCollan*, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979).

Each of the defendants has stated under oath his or her good faith belief that the things done by the defendants relative to the case of *Commonwealth v. Harris* were done in a good faith belief that such was his duty and that it was done without purpose or thought to deprive plaintiff of any right secured under the Constitution or laws of the United States. Such an affirmation would necessarily include the right under the Fourteenth Amendment to equal protection of the laws without regard to race. As noted, plaintiff has not contested in any way these sworn assertions on the part of each defendant.

■ In this connection the Court is mindful of the admonition reiterated in *Harlow v. Fitzgerald*, 457 U.S. 800, 808, 102 S.Ct. 2727, 2733, 73 L.Ed.2d 396, 404 (1982) wherein the Supreme Court quoted from *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978):

"Insubstantial lawsuits can be quickly terminated by federal courts alert to the possibilities of artful pleading. Unless the complaint states a compensable claim for relief ... it should not survive a motion to dismiss. Moreover, the Court recognized in Scheur that damages suits concerning constitutional violations need not proceed to trial, but can be terminated on a properly supported motion for summary judgment based on the defense of immunity.... In responding to such a motion, plaintiffs may not play dog in the manger; and firm application of the Federal Rules of Civil Procedure will ensure that federal officials are not harassed by frivolous lawsuits."

While both Harlow and Butz dealt with federal officials, I know of no reason why federal courts should lend themselves to the harassment of State officials either.

■ But good faith immunity is not the only defense which some or all of these defendants have. No allegation is made that Sheriff Wingo played any personal part in any of the events complained of by plaintiff. As a constitutional officer he has the responsibility for management of the jail but there is no allegation that he personally did or failed to do anything which discomfited plaintiff. He can only be liable, if at all, on some theory of respondeat superior and this theory will not support liability under § 1983. *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir.1977).

■ Even if the complaint be deemed to allege personal involvement, Wingo's unrefuted affidavit shows no personal involvement. Indeed, all he did was see to it that the jail carried out orders issued by proper judicial officers that certain persons, including plaintiff, should be held in jail pending trial. To have done other than what he did in this case would have been misfeasance.

■ Similarly, there is no allegation of any personal involvement of the Commonwealth Attorney, Watson. Watson denies

under oath that he was personally involved. His only liability would have to be vicarious. Vicarious liability is insufficient. *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir.1977).

■ Defendant Shaffer is alleged to have appeared before the general district court to argue that the court should not reduce plaintiff's bond. In her affidavit she acknowledges that she did this as a part of her prosecutorial duty as an Assistant Attorney for the Commonwealth. It cannot be argued that her appearance before the court was anything other than a part of her prosecutorial duty. She is absolutely immune from liability under § 1983 for this conduct and she ought not to be harassed by this lawsuit filed in the teeth of *Imbler v. Pachtman*, 424 U.S. 409, 424, 96 S.Ct. 984, 992, 47 L.Ed.2d 128 (1976). In addition to her absolute prosecutorial immunity, Miss Shaffer has stated under her oath her good faith in every aspect of her conduct. This is not refuted and thus she enjoys qualified immunity in addition to absolute immunity.

■ Chief of Police Pittman is not alleged to have engaged personally in any action harmful to plaintiff. Like the Attorney for the Commonwealth, he apparently was sued merely because he was there. *Vinnedge v. Gibbs, supra,* has been the law in this circuit for eight years. It is an oft-cited case. There was no reason in law or in fact to sue him under the allegations of the complaint. Beyond that, however, he has stated under oath facts sufficient to show no personal involvement and a good faith immunity.

■ Finally, we come to Friedline. Officer Friedline made a prompt, thorough, and professional investigation into a heinous crime. Within less than twelve hours he was able to present to a magistrate sufficient facts to obtain a warrant for plaintiff's arrest. Friedline effected the arrest and turned over his prisoner to the jailor. Why he should be sued for $100,000 for doing his duty in such a fashion is beyond my comprehension. Friedline did not imprison plaintiff; he arrested him. It is undisputed that he gave all the warnings of rights to which plaintiff was entitled. Despite significant evidence of plaintiff's involvement in the crime, Officer Friedline ceased the investigation to which plaintiff had acquiesced and took plaintiff to his home upon plaintiff's request. Later, having gathered sufficient evidence to justify an arrest without warrant, Officer Friedline took the precaution of appearing before a magistrate and obtaining an arrest warrant. Officer Friedline promptly took plaintiff before a magistrate after plaintiff's arrest. It is hard to imagine what more or less could have been required of the officer.

■ There remains the allegation in the complaint with respect to the "willingness of the defendants to effect, tolerate and continue the false imprisonment" because plaintiff is black and the victim was white.

Even if all of the defendants had jointly and severally taken oath that they were imbued with the vilest racial animus against black persons, it is impossible to discern from any act or omission in their conduct toward plaintiff even a hint that they gave vent to that animus. The proceedings, as shown by the exhibits and the affidavits, did not vary from an orderly, proper, and constitutionally correct course. It is true that the rapist was identified as black. It is true that the victim was identified as white. But defendants owed plaintiff no greater, nor any less, regard because of these facts. The Constitution is the same for black persons charged with a crime against white persons as it is for white persons similarly charged with crimes against black persons. Criminals are criminals and victims are victims. Their race is irrelevant.

What would plaintiff reasonably have required of defendants that they didn't do? Surely there was an imperative need to investigate the perverted criminal act; there is no complaint of any lack of fair treatment during the investigation; probable cause to arrest was abundant; there was a prompt arraignment, a prompt set-

ting of reasonable bail; on an affidavit of poverty, counsel was appointed; the continuances granted were reasonable and were granted only after a full opportunity for plaintiff to be heard; though he had ample opportunity to do so, plaintiff raised no racial equal protection claim; the dismissal of the action followed the confused testimony of a seriously ill old woman who had suffered a supreme indignity and was being asked to tell about the event and identify her assailant. Plaintiff was correctly treated at every step of the proceeding.

Plaintiff only asserts his race, and that of the victim, as lifting the matter out of the ordinary. But such assertion merely amounts to alleging that something unfortunate happened to plaintiff *and* that he is black. If State officials inflict harm on one *because* he is black, § 1983, and this Court, stand ready to provide due process and a full measure of damages. Otherwise, the race of parties litigant is wholly irrelevant—as in this case.

■ There is a still further reason for dismissing this action. It being conclusively shown by the facts and the affidavits that plaintiff's race was, as it should be, legally irrelevant in this case, even if defendants be properly charged with the common law offense of false imprisonment, as he alleges in his complaint, plaintiff has not been deprived of a right secured to him by the Constitution of the United States. The Constitution does not protect us against the common law tort of false imprisonment. In *Cramer v. Crutchfield*, 496 F.Supp. 949 (E.D.Va.1980) this Court attempted to determine the status of similar common law tort claims of abuse of process and malicious prosecution. The reasoning therein contained with respect to abuse of process and malicious prosecution is equally applicable to a tort claim of false imprisonment. Accordingly, on the reasoning of *Cramer v. Crutchfield* as affirmed by the Fourth Circuit in *Cramer v. Crutchfield*, 648 F.2d 943 (4th Cir.1981) defendants are entitled to summary judgment.

■ The mere allegation of a common law tort, though allegedly committed by State officials, does not in and of itself constitute a § 1983 constitutional tort. *Occhino v. United States*, 686 F.2d 1302, 1311 (8th Cir.1982), (citing *Cramer v. Crutchfield*). To similar effect is *Henry v. City of Minneapolis*, 512 F.Supp. 293, 296 (D.Minn.1981) (malicious prosecution).

This case should never have been filed. It is clear to me that the story told to counsel for plaintiff by his client and the actual events of the late summer and fall of 1982 are vastly different. I feel sure that counsel for plaintiff was disillusioned when he saw the affidavits and the exhibits filed by defendants in support of their motion for summary judgment. This may explain his failure to file a reply brief and counter-affidavits.

Summary judgment must issue.

And it is so ORDERED.