Wayne ANGEL and Kaylin
Angel, Plaintiffs,

v.

Leonard C. KASSON, Investigator, New York State Police, in his individual and official capacity; Robert C. Schanck, Peace Officer, New York State Police, in his individual and official capacity; and James Horan, Lieutenant, New York State Police, in his individual and official capacity, and his predecessor(s) and successor(s) in office, Defendants.

No. 82–CV–1079.

United States District Court,
N.D. New York.

Dec. 29, 1983.

Ricken, Goldman, Sussman & Blythe, Kingston, N.Y., for plaintiffs; Alan N. Sussman, Kingston, N.Y., of counsel.

Robert Abrams, Atty. Gen. of the State of N.Y., Albany, N.Y., for defendants; John J. Pickett, Asst. Atty. Gen., Albany, N.Y., of counsel.

## MEMORANDUM–DECISION and ORDER

MINER, District Judge.

### I

Plaintiffs commenced this action to redress violations of their civil rights "arising from their questioning, arrest and prosecution by defendants" Leonard C. Kasson and Robert C. Schanck, New York State Police Investigators and James Horan, New York State Police Lieutenant. The action was brought pursuant to 42 U.S.C. § 1983, and jurisdiction is predicated upon 28 U.S.C. §§ 1331 and 1343. The cause was tried by the Court without a jury on August 1st and 2nd, 1983.[1] The final submissions of counsel were filed in the Clerk's office on September 6, 1983. There follow the findings of fact and conclusions of law mandated by Fed.R.Civ.P. 52(a).

### II

Ari-El Angel, a male child, was born to the plaintiffs on September 23, 1981 at the plaintiffs' residence, 57 Tinker Street, Woodstock, Ulster County, New York. The residence consisted of two rooms divided by a blanket or curtain. One room was used by plaintiff Kaylin Angel, the child's mother, to conduct an astrology business, and the other was occupied by the plaintiffs and their other child, Ju-El Angel, aged two, as a dwelling. Assisting in the delivery of Ari-El were plaintiff Wayne Angel, the child's father, and Annelisa Angel, a sister of plaintiff Kaylin Angel. Kaylin had consulted a physician on one occasion when she felt anemic after three months of pregnancy, but she sought no further medical assistance relating to Ari-El's birth, which occurred approximately seven weeks prior to term.

After the birth of Ari-El, the plaintiffs continued to sleep together on a rollaway couch bed, with the baby sleeping on Kaylin's stomach. The other child had a separate bed in the same room. Approximately three days after he was born, Ari-El was taken to a local delicatessen, where his father weighed him on a scale and found his weight to be three pounds eleven ounces. When he was approximately one week old, Wayne Angel took his son along with

---

**1.** The following witnesses testified on behalf of plaintiffs: Kaylin Diana Angel, plaintiff; Dr. Harry C. McNamara, Chief Medical Examiner of Ulster County; Howard Stephan Lotsof, a friend of the plaintiffs and a visitor to their home shortly before the death of their child; and Wayne Angel, plaintiff. Defendants called the following witnesses: Wayne Beyea, Senior Investigator, New York State Police and Supervisor of the Bureau of Criminal Investigation at the Hurley Barracks; defendant James J. Horan, Lieutenant, New York State Police and Commander of the Hurley Barracks; defendant Robert C. Schanck, New York State Police Investigator; and defendant Leonard C. Kasson, New York State Police Investigator. Various exhibits offered by the parties were received in evidence.

him when he went to be treated by a plastic surgeon in Albany for an injury to his finger. The surgeon looked at the child, remarked on his appearance, but was not asked to examine him in any professional way. In fact, Ari-El never was examined by any physician during his brief lifetime. On October 7, 1981, Wayne Angel again weighed his newborn son on the delicatessen scale, which then registered just under five pounds. Plaintiffs are members of the American Vegan Society. As such, they eat no animal products and do not use any substance derived from animal products. Their beliefs do not prohibit the seeking of medical treatment when needed, but they are constrained to "do every thing in [their] power" [2] before seeking medical assistance.

For several days prior to October 11, 1981, Ari-El developed congestion and had a runny nose, which his mother cleaned with an aspirator. The infant was afforded no professional medical treatment of any kind for these conditions. At about 8:00 o'clock A.M. on October 11th, Kaylin Angel awoke to find the baby's skin cold to the touch and discolored. The baby was not breathing, and she handed him to her husband, who attempted mouth-to-mouth resuscitation while she called an ambulance. The child was pronounced dead on arrival at the Kingston Hospital shortly thereafter. An autopsy was performed on October 12, 1981. The microscopic description contained in the autopsy report included findings of marked congestion and focal edema of the lungs and congestion of the liver. The pathologist made the following final anatomic diagnoses: "1. Prematurity. 2. Partial pulmonary atelectasis, focal." [3] The medical examiner noted in his report that the "autopsy revealed a 3 lb. 10 oz. infant with positive findings of pneumonitis." (Report of death by H.C. McNamara, Medical Examiner, Comments section). He listed broncho-pneumonia as the immediate

cause of death on the death certificate and "premature infant" as a condition contributing to death.

### III

On October 11, 1981, the Ulster County Medical Examiner requested the Woodstock Police Department to investigate the circumstances surrounding the death of Ari-El Angel. On October 12, the Woodstock Police Chief requested the state police to take over the investigation. Acceding to this request, Senior Investigator Wayne Beyea, Supervisor of the Bureau of Criminal Investigation at the Hurley Barracks, assigned Investigator Leonard C. Kasson to conduct the inquiry. He also assigned Investigator Robert C. Schanck to assist in the investigation. Investigator Kasson was directed to report his findings for evaluation by his supervisor.

After speaking with Senior Investigator Beyea, Medical Examiner McNamara and members of the Woodstock Police Department, Kasson attended the autopsy conducted by the pathologist, Dr. Cheema, at the Ulster County Morgue. Dr. McNamara, the medical examiner, also was present and the findings of the pathologist were discussed. Later that day, Kasson spoke by telephone with Kaylin Angel, who had just returned from her son's funeral, and asked her to come to the state police station to give a statement. When he was advised that the plaintiffs had no transportation, Kasson departed for the plaintiffs' residence, accompanied by Investigator Schanck, arriving there at about 5:00 o'clock P.M. on October 12th. Although plaintiffs indicated that they preferred not to go to the station and asked whether their written statements could be prepared and brought to them at home, they eventually did agree to go with the investigators. At no time were they advised that they

---

**2.** Statement of Kaylin Diana Angel, October 12, 1981, plaintiffs' exhibit 2.

**3.** Atelectasis is defined as "incomplete expansion of a lung or a portion of a lung, occurring congenitally as a primary or secondary condition or as an acquired condition." Dorland's Illustrated Medical Dictionary 133 (26th ed. 1981). The preliminary anatomic diagnoses contained in the preliminary autopsy report were as follows: "1. Possible pneumonitis. 2. Prematurity."

were under arrest or that they were required to go with the investigators.

At the Hurley Station, plaintiff Kaylin Angel was interviewed by defendant Kasson, and plaintiff Wayne Angel was interviewed by defendant Schanck. During the interview, each plaintiff gave answers to questions posed by the respective investigators. Each question and answer was typed by the investigators, and the statements ultimately were signed by the plaintiffs.[4] Although plaintiff Kaylin Angel was visibly upset over the death of her son and cried during the interview, her statement was lucid and her answers were responsive to the questions asked by Kasson. Both plaintiffs signed their statements without hesitation and testified at trial that the statements were true and correct. During the time plaintiffs were at the station, defendants Kasson and Schanck had a brief conversation with defendant Horan, the Commander of the Hurley Barracks. Although Horan had no responsibility for the Angel case, had no dealings with the plaintiffs, and furnished no assistance to the investigators, he was furnished a brief oral summary regarding the status of the investigation. The plaintiffs' interviews were completed at about 6:00 o'clock P.M. and they were transported to their home by uniformed members of the state police.

After he acquired the signed statements of plaintiffs, defendant Kasson reported the results of his entire investigation to his superior, Investigator Beyea, who then consulted with the Ulster County District Attorney regarding possible charges to be brought against the plaintiffs. Prior to that consultation, Beyea had advised the District Attorney of the status of the pending investigation. Based on all the information supplied by defendant Kasson and then available to them, Senior Investigator Beyea and the District Attorney determined that there was sufficient evidence to charge the plaintiffs with endangering the welfare of a child, in violation of subdivision 1 of § 260.10 of the New York Penal Law[5] and defendant Kasson was so advised. Kasson testified that he was influenced by the opinions of the District Attorney and his superior, but made an independent judgment that probable cause existed to charge the plaintiffs with the crime.

On October 13, 1981, at about 5:00 o'clock P.M., defendant Kasson, accompanied by Woodstock Police Chief Ostrander, presented himself at the plaintiffs' house and served the plaintiffs with appearance tickets[6] directing them to appear at the Woodstock Town Court on October 29, 1981 at 7:00 o'clock P.M. to answer charges of endangering the welfare of a child. Plaintiffs appeared at the town court with their attorney at the appointed date and time and were served with a copy of an Information/Complaint, signed by defendant Kasson, detailing the charges against them. Plaintiffs were arraigned and released on their own recognizance for a later court appearance. Immediately thereafter, they were photographed, fingerprinted and otherwise "processed" at the Woodstock Police Station located next door to the town court.[7] They never returned to

---

4. The statement of plaintiff Kaylin Angel, taken by defendant Kasson, was received in evidence as plaintiffs' exhibit 2. The statement of Wayne Angel, taken by defendant Schanck, was received in evidence as plaintiffs' exhibit 3. Each statement included the *Miranda* warnings and an acknowledgment thereof by the party who gave the statement.

5. Section 260.10(1) of the New York Penal Law provides as follows:
    A person is guilty of endangering the welfare of a child when:
    1. He knowingly acts in a manner likely to be injurious to the physical, mental, or moral welfare of a male child less than sixteen years old or a female child less than seventeen years old or directs or authorizes such child to engage in an occupation involving a substantial risk of danger to his life or health.

    Endangering the welfare of a child is a class A misdemeanor.

6. Defendants' exhibit A includes two appearance tickets, one served on each plaintiff.

7. Apparently, plaintiffs' attorney objected to questions, incidental to the fingerprinting and photographing, which were put to plaintiffs. These objections were reported to the town justice, who threatened to fix bail in the sum of

court because the charges against them were dismissed "in the interest of justice" [8] by Town Justice Slayton on March 11, 1982. The dismissal was ordered on the recommendation of Assistant District Attorney Donald A. Williams, Jr., who "reached a conclusion that the requisite criminal intent which is necessary for conviction in the criminal charge is absent in the present case." (Letter dated March 2, 1982 to Honorable Sidney Slayton, plaintiffs' exhibit 5).

IV

The threshold inquiry in a § 1983 action is twofold. The Court must consider whether the conduct complained of was committed by a person acting under color of state law as well as whether that conduct deprived a person of rights, privileges or immunities secured by the Constitution. *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981). There is no question that the defendants, in their capacities as officers of the New York State police, acted "under color of state law." *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). The issue before the Court, then, is whether or not any action of the defendants served to deprive plaintiffs of any of their constitutional rights.

In a § 1983 action the burden is on the plaintiff to prove by a preponderance of the evidence that conduct of the defendant "caused him to be subjected to a deprivation of constitutional rights." *Duchesne v. Sugarman*, 566 F.2d 817, 831 (2d Cir.1977); *see also Rizzo v. Goode*, 423 U.S. 362, 370–71, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976). The gravamen of plaintiffs' complaint is that the actions of defendants constituted violations of plaintiffs' constitu-

tional rights under the first, fourth, fifth, sixth and fourteenth amendments. Specifically, the conduct complained of here relates to the filing of criminal charges against the plaintiffs, the alleged arrest of the plaintiffs, and the interrogation of the plaintiffs at the station house and at the time of their arraignment. Essentially, plaintiffs have set forth claims of false arrest and malicious prosecution, *Baker v. McCollan*, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979); *Singleton v. City of New York*, 632 F.2d 185 (2d Cir.1980), *cert. denied*, 450 U.S. 920, 101 S.Ct. 1368, 67 L.Ed.2d 347 (1981), as well as claims of deprivation of counsel and compulsory self-incrimination.

V

In order for plaintiffs to recover on the claims grounded in malicious prosecution, four distinct elements must be established. The plaintiffs must demonstrate that (1) the defendants either commenced or continued a criminal proceeding against them; (2) the proceeding terminated in their favor; (3) there was no probable cause for the criminal proceeding; and (4) the criminal proceeding was initiated out of actual malice. *Russo v. State of New York*, 672 F.2d 1014, 1018 (2d Cir.1982); *Martin v. City of Albany*, 42 N.Y.2d 13, 16, 396 N.Y.S.2d 612, 614, 364 N.E.2d 1304, 1307 (1977); *Broughton v. State of New York*, 37 N.Y.2d 451, 457, 373 N.Y.S.2d 87, 94, 335 N.E.2d 310, 314, *cert. denied*, 423 U.S. 929, 96 S.Ct. 277, 46 L.Ed.2d 257 (1975).[9] It is uncontroverted that a criminal proceeding was commenced against the plaintiffs and that the proceeding was ultimately terminated in their favor. Whether there was probable cause for the institution

---

$500.00 if the plaintiffs did not furnish the required information relating to their personal histories. On advice of counsel, the information was supplied and release of the plaintiffs on their own recognizance was continued.

8. Section 170.40 of the N.Y.Crim.Proc. Law provides for the dismissal of a misdemeanor complaint in the interest of justice even though there may be no basis for dismissal as a matter

of law. It appears here, however, that there was a dismissal as a matter of law.

9. These elements must be established to sustain a § 1983 claim as well as a tort action under New York law. *See Singelton v. City of New York*, 632 F.2d 185, 195 (2d Cir.1980), *cert. denied*, 450 U.S. 920, 101 S.Ct. 1368, 67 L.Ed.2d 347 (1981); *Brault v. Town of Milton*, 527 F.2d 730, 740 (2d Cir.1975) (en banc).

of the proceeding is vigorously disputed here.

■ A showing of probable cause requires a demonstration of a totality of circumstances establishing a fair probability of the existence of criminal activity.[10] Whether the institution of the criminal proceedings against plaintiffs was constitutionally valid depends upon whether there were available to defendant Kasson[11] facts, circumstances and trustworthy information sufficient to justify a prudent person's belief that plaintiffs had committed the offense charged. *See Beck v. Ohio,* 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964) (standard of probable cause for arrest). In the opinion of the Court, the totality of the facts and circumstances available to defendant Kasson fully justified his determination that there was probable cause for the commencement of criminal proceedings against the plaintiffs.

■ At the time he issued and served the appearance tickets on October 13, 1981, defendant Kasson had available to him the written and oral statements of the plaintiffs, the findings of the county medical examiner and the pathologist who performed the autopsy[12] and the opinions of his superior and the district attorney. Investigator Kasson was aware that the plaintiffs were the parents of a male infant who was seven weeks premature. He was aware that the infant was delivered at home and never was afforded any professional medical care from the day of his birth. Investigator Kasson knew that the plaintiffs' beliefs excluded such care except as a "last resort." He also knew that the infant weighed three pounds eleven ounces three days after birth, approximately five pounds on October 7, 1981 and three pounds ten ounces, representing a significant weight loss, at the time of the autopsy on October 12, 1981. Investigator Kasson had information that plaintiffs were aware of the infant's congestion but did nothing about it in the way of seeking professional assistance, that the pathologist found marked congestion and focal edema of the lungs and that the medical examiner listed broncho-pneumonia as the cause of the infant's death. With this information and knowledge available to him, it cannot be said that defendant Kasson lacked probable cause to institute criminal charges of endangering the welfare of a child against these plaintiffs. The Court rejects plaintiffs' claim that it should have been obvious to Kasson that the element of intent was missing from the case of plaintiffs, as later determined by Assistant District Attorney Williams. Direct evidence of intent is very

10. *See Illinois v. Gates,* —— U.S. ——, 103 S.Ct. 2317, 76 L.Ed.2d 527 (U.S.1983). The *Gates* decision instructs reference to a totality of the circumstances analysis in which the task is to make a practical decision, based upon the circumstances revealed, whether "there is a fair probability that contraband or evidence of crime will be found in a particular place." Id. at ——, 103 S.Ct. at 2332. While *Gates* dealt only with the probable cause showing required for the issuance of a search warrant by a magistrate, there is no reason why the same standard should not govern the initiation of charges against the plaintiffs at bar. According to *Gates,* "it is clear that 'only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.'" *Id.* at ——, 103 S.Ct. at 2330 (quoting *Spinelli v. United States,* 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969)).

11. Investigator Kasson was the only defendant involved in the initiation of criminal proceedings against these plaintiffs. He subscribed the appearance tickets as well as the Information/Complaint. The only part played by defendant Schanck in the entire investigation was in assisting in the transportation of plaintiffs to the Hurley Barracks and in taking a statement from plaintiff Wayne Angel. Lieutenant Horan had no part in the investigation or the commencement of criminal proceedings. Although he was the commander of the Hurley Barracks, Horan had no responsibility for investigations conducted by members of the Bureau of Criminal Investigation assigned to the barracks.

12. Although Kasson may not have had the final written reports of the medical examiner and the pathologist at the time the appearance tickets were prepared, he had been present at the autopsy and had adequate opportunity for a full discussion with both Dr. Cheema, the pathologist, and Dr. McNamara, the medical examiner, regarding their findings. Indeed, it appears that Kasson spoke with Dr. McNamara on two or more occasions prior to the issuance of the appearance tickets.

rare, and the facts and circumstances surrounding a criminal act usually must be examined by the trier of fact to ascertain intent. *See People v. Getch*, 50 N.Y.2d 456, 429 N.Y.S.2d 579, 407 N.E.2d 425 (1980).

■ Even if lack of probable cause were established here, the malicious prosecution claim would fail for want of proof of the additional element of malice. Malice is an indispensable element of a malicious prosecution claim under state law, *Russo v. State of New York*, 672 F.2d 1014, 1018 (2d Cir.1982); *Martin v. City of Albany*, 42 N.Y.2d 13, 16, 396 N.Y.S.2d 612, 614, 364 N.E.2d 1304, 1306 (1977), and also must be demonstrated in order for a plaintiff to prevail under § 1983, *see Brault v. Town of Milton*, 527 F.2d 730, 738–40 (2d Cir. 1975) (en banc); *Tucker v. Maher*, 497 F.2d 1309, 1314–15 (2d Cir.), *cert. denied*, 419 U.S. 997, 95 S.Ct. 312, 42 L.Ed.2d 271 (1974); *Laverne v. Corning*, 316 F.Supp. 629, 635–36 (S.D.N.Y.1970).

■ Of course, the malice that need be proven " 'does not necessarily involve spite, hatred, malevolence, or a corrupt design; it is sufficiently established by showing that the baseless suit was instituted from any improper and wrongful motive.' " *Brault v. Town of Milton*, 527 F.2d at 739 (quoting *Sparrow v. Vermont Savings Bank*, 95 Vermont 29, 33, 112 A. 205, 207 (1921)). There is no evidence in the record of any improper motive on the part of defendant Kasson in his decision to file criminal charges. Plaintiffs however, contend that "[t]he trier of facts may infer the existence of actual malice from the fact that there was no probable cause to initiate the proceeding." (Plaintiffs' post-trial brief pp. 18–19). While the absence of probable cause does bear on the malice issue, the two remain independent elements of a malicious prosecution action. *Martin v. City of Albany*, 42 N.Y.2d 13, 17, 396 N.Y.S.2d 612, 614, 364 N.E.2d 1304, 1306 (1977); *see also Brault v. Town of Milton*, 527 F.2d at 739–40 & n. 6. Only where probable cause to initiate a proceeding is "so totally lacking" may malice reasonably be inferred.

42 N.Y.2d at 17, 396 N.Y.S.2d at 615, 364 N.E.2d at 1307. Because this Court already has concluded that probable cause did in fact exist, no such inference of malice properly may be drawn.

## VI

■ "The constituent elements of a cause of action for false imprisonment are the detention or restraint of one against his will, and the unlawfulness of such detention or restraint, and the plaintiff must establish such constituent elements by a fair preponderance of the credible evidence in order to recover for false arrest and imprisonment." 22 N.Y.Jur. False Imprisonment § 3. In order for a plaintiff to prevail on such a state tort claim, he must show that defendant intended to confine him, that he was conscious of confinement and that the confinement was not privileged. *Broughton v. State of New York*, 37 N.Y.2d 451, 456–57, 373 N.Y.S.2d 87, 93, 335 N.E.2d 310, 314, *cert. denied*, 423 U.S. 929, 96 S.Ct. 277, 46 L.Ed.2d 257 (1975). The same elements must be established to prove constitutional claims of unreasonable seizure and of due process deprivation grounded in false arrest and asserted under the provisions of 42 U.S.C. § 1983. *Baker v. McCollan*, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). Here, the elements of detention, restraint or confinement are lacking in evidentiary support. Plaintiffs voluntarily accompanied defendants Kasson and Schanck to the Hurley Barracks on October 12th. They were not under arrest at that time and were not advised that they were under any compulsion to go to the barracks. No force or coercion of any kind was employed, and it was not the intention of the police officers to restrain the plaintiffs in any way. Plaintiffs agreed to give formal statements to the officers and freely remained in the company of the investigators for a brief time for that purpose.

■ Plaintiffs' argument that the issuance of the appearance tickets constituted an arrest also is rejected, it being well settled that the issuance of such tickets

under the provisions of N.Y.Crim.Proc. Law § 150.10 [13] does not constitute an arrest, *Robart v. Post-Standard*, 74 A.D.2d 963, 425 N.Y.S.2d 891 (3d Dep't 1980), *aff'd*, 52 N.Y.2d 843, 437 N.Y.S.2d 71, 418 N.E.2d 664 (1981). *Rosario v. Amalgamated Ladies' Garment Cutters' Union, Local 10*, 605 F.2d 1228 (2d Cir.1979), *cert. denied*, 446 U.S. 919, 100 S.Ct. 1853, 64 L.Ed.2d 273 (1980) and *United States v. Ricard*, 563 F.2d 45 (2d Cir.1977), *cert. denied*, 435 U.S. 916, 98 S.Ct. 1471, 55 L.Ed.2d 507 (1978), cited by plaintiffs in support of their argument, are inapposite. *Rosario* holds merely that the issuance of an appearance ticket commences a prosecution for the purposes of determining whether an action for malicious prosecution lies, a proposition not in dispute here. In *Robart*, the defendant was stopped for a traffic violation and searched. When cocaine was discovered on his person, he was arrested and taken to the station house, where he was found to be in possession of stolen money orders. In holding that there was sufficient predicate for the search, and in affirming the defendant's conviction for unlawful possession of stolen money orders, the *Robart* court made no reference whatsoever to the issuance of appearance tickets.

■ The detention of plaintiffs at the time of their arraignment for fingerprinting, photographing and questioning incidental thereto was required by statute. N.Y.Crim.Proc. Law §§ 150.70, 160.10. Such detention therefore was privileged and cannot be considered a basis for a false arrest claim. Indeed, § 150.70 mandates the Court, in the case of one whose appearance has been secured by the issuance of an appearance ticket, to "direct that the defendant be fingerprinted by the appropriate police officer or agency, and that he appear at an appropriate designated time and place for such purpose." Whenever fingerprints are required to be taken, photographs may be taken as well. N.Y.Crim. Proc. Law § 160.10(3). Thus, the restraint of plaintiffs by defendant Kasson [14] for "processing" was required by statute and court order. In any event, as has been demonstrated, Investigator Kasson had reasonable cause to believe that plaintiffs had committed a crime and thus he was empowered to arrest them without a warrant. N.Y.Crim.Proc. Law § 140.10(1)(b).

■ The Court finds no deprivation of plaintiffs' constitutional right to counsel. Plaintiffs were fully advised of their right to counsel before questioning at the Hurley Station and declined to consult an attorney at that time.[15] An attorney representing both plaintiffs was present at the time of their arraignment and accompanied plaintiffs to the Woodstock Police Station. The Court further finds no infringement of any constitutional rights in connection with any statements, written or oral, made by plaintiffs to defendants Kasson and Schanck. All statements were freely and voluntarily given, without coercion or duress of any kind.

## VII

With respect to all the claims asserted by plaintiffs, this Court concludes that plaintiffs have failed to establish any violation of their constitutional rights by any defend-

---

**13.** Section 150.10 of the N.Y.Crim.Proc. Law provides as follows:

An appearance ticket is a written notice issued and subscribed by a police officer or other public servant authorized by state law or local law enacted pursuant to the provisions of the municipal home rule law to issue the same, directing a designated person to appear in a designated local criminal court at a designated future time in connection with his alleged commission of a designated offense. A notice conforming to such definition constitutes an appearance ticket regardless of whether it is referred to in some other provision of law as a summons or by any other name or title.

**14.** Defendants Schanck and Horan were not involved in the fingerprinting, photographing and incidental questioning of plaintiffs at the Woodstock Police Station.

**15.** Wayne Angel, in declining to exercise his right to consult an attorney, said that he already consulted an attorney and did not desire further legal advice.

ant, and entry of judgment in favor of defendants is directed.

It is so Ordered.