John PENNINGTON, et al., Plaintiff,

v.

Robert BUCAN, Agent, et al., Defendant.

Civ. No. C–1–84–1038.

United States District Court, S.D. Ohio, W.D.

Aug. 16, 1985.

James A. Rader, Cincinnati, Ohio, for plaintiff.

Elizabeth Gere Whitaker, Asst. U.S. Atty., Thomas R. Smith, Cincinnati, Ohio, for defendant.

## ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

CARL B. RUBIN, Chief Judge.

This matter is before the Court on the Motions of defendants Robert A. Bucan, George W. Connell III, Valerie L. Vella, Louis P. Russo and Michael A. Campi for Summary Judgment (Doc. no. 22), and upon the separate Motion for Summary Judgment filed by defendant Jeffrey Lang (Doc. no. 21). Supporting such motions are affidavits of all defendants as well as affidavits of nondefendants Lori Grimes, David Sommer, Vincent Presutti and Bart West.

In opposition to such motions the plaintiffs have filed a memorandum supported by affidavits of plaintiffs John and Norma Pennington. (Doc. 30)

The background facts in this matter, which are not in dispute disclose that agents of the Federal Bureau of Investigation were attempting to locate one Johnny Grimes sought in an attempted murder in Kentucky. The agency had reason to believe that Grimes might be armed and dangerous. In an effort to locate him, agents had conducted stakeouts of his estranged wife's home at 6231 Mernic Drive. One such stakeout on June 30, 1984 proved to be unsuccessful.

During the evening of July 2, 1984, off duty defendant Robert Bucan, while attending a social gathering with other FBI agents, received a call from Mrs. Grimes that the fugitive Johnny Grimes might be in the area. Agent Bucan sought the assistance of other agents who were present and likewise off duty. It is uncontroverted that at the social gathering some of the agents had consumed small quantities of beer.

A surveillance of the Grimes residence and neighborhood was begun and proved uneventful until approximately midnight. At that time, a cream colored station wagon was repeatedly observed slowly passing in front of the Grimes residence.[1] Upon inquiry of Mrs. Grimes, the defendants were advised that Johnny Grimes did have access to a similar automobile. The agents were directed to stop the vehicle and determine whether or not Johnny Grimes was in it.

Two F.B.I. vehicles equipped with flashing lights thereupon followed the vehicle and ultimately required it to stop. The occupants were ordered out of the vehicle, required to produce identification, and released. The occupants of the vehicle proved to be the plaintiffs in this case. No arrests were made and no effort to detain the plaintiffs was made, once it was determined that Johnny Grimes was not present.

Predictably, the affidavits of the parties disagree. For example, it is the assertion of the defendants that during the efforts to stop the vehicle, blue lights were flashed, the defendants identified themselves as F.B.I. agents, and the plaintiffs sought to

---

1. The affidavits of defendants assert that the automobile passed in front of the residence "three to four times". Plaintiffs admit passing the residence at least twice. (Declaration of Norma Pennington ¶ 5; Declaration of John Pennington ¶ 5)

escape by attempting to run down one of the agents. Defendants deny that there were any blue lights, deny that the defendants identified themselves, and deny that they sought to escape. The variance of these details is not material. Whether or not the agents had consumed alcoholic beverages three houres earlier is not significant. What is significant is the examination of defendants' conduct in accordance with *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 and *Mitchell v. Forsyth*, —— U.S. ——, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).

■ The defendants have asserted a qualified immunity and under such circumstances the inquiry by a trial court in a motion for summary judgment is different from an inquiry into such a motion under all other circumstances. The *Mitchell* Court pointed out that "The entitlement is an *immunity from suit* rather then a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth supra*, at ——, 105 S.Ct. at 2816 (emphasis not added).

The *Harlow* Court established the standard in a qualified immunity defense. "We have held that qualified immunity would be defeated if an official *'knew or reasonably should have known* that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff] *or* if he took the action *with the malicious intention* to cause a deprivation of constitutional right or other injury.'" (457 U.S. at 815, 102 S.Ct. at 2737 citing *Wood v. Strickland*, 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975) (emphasis not added)).

■ Both *Harlow* and *Mitchell* dealt with situations where it was not clear that the defendant's action violated the constitutional rights of the plaintiff. In the matter at hand, the situation differs. There is a right and indeed a duty of law enforcement officers to apprehend persons charged with crimes, to pursue them if necessary, to

search them for weapons, and to require that they produce identification. The Fourth Amendment to the constitution of the United States does not prohibit all searches and seizures. It only prohibits *unreasonable* searches and seizures. Whether or not defendants conducted the search of plaintiffs and their vehicle in a fashion gentle enough to be acceptable to plaintiffs is not at issue. The question deals only with the right of defendants to stop and search. The Court's inquiry must be directed to the facts as the defendants knew them and the action that they took in accordance therewith. It is undisputed that they had seen a vehicle late at night slowly and repeatedly passing a house under surveillance. It is likewise undisputed that the defendants were advised that the suspect they sought had access to a similar vehicle. It is further undisputed that the suspect was wanted for a crime of violence and might be armed and dangerous. Under such circumstances, apprehension and search of plaintiffs is a reasonable action based upon that information available to them.

■ In discussing an investigatory stop, the Supreme Court of the United States, in *United States v. Cortez*, 449 U.S. 411, 417, 418, 101 S.Ct. 690, 694, 695, 66 L.Ed.2d 621 (1980), made observations that are pertinent herein. In footnote [2] that follows the statement on page 417, 101 S.Ct. at 695 "An investigatory stop must be justified by some objective manifestation that the person stopped is or is about to be engaged in criminal activity," is the following: "Of course an officer may stop and question a person *if there are reasonable grounds to believe* that person is wanted for past criminal conduct". (Emphasis added) The Cortez Court went on to discuss the "illusive concept of what cause is sufficient to authorize police to stop a person." The Court pointed out on page 418: "the process does not deal with hard certainties but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common sense

**2.** Had they done otherwise they might well have been derelict in their sworn duty.

conclusions about human behavior; jurors as fact finders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." Law enforcement officers are not held to a standard of perfection. If they act in good faith, they are protected from liability even though it turns out that their assumption was mistaken. *See Baker v. McCollan,* 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979).

The "library analysis by scholars" referred to in *Cortez* is particularly applicable here. It is easy for attorneys and judges in the comfort and calm of their chambers to ponder in a detached fashion as to how conduct by law enforcement officers could have been improved. Indeed, after the fact and after due deliberate reflection, some improvement can always be suggested. Unfortunately, the problems of law enforcement do not occur in the cloistered environment of the legal system. They occur with great frequency at night, in strange surroundings and under circumstances of stress, noise, confusion, and a potential for great personal danger. The persons with whom law enforcement officers customarily deal are not impressed by abstract arguments or detached reflection. They are neither hampered by nor concerned with law, ethics, or constitutional rights. They can and do kill. This is the real world and the "totality of circumstances" that the *Cortez* Court speaks of, under which conduct must be judged. Confronted as defendants were by a vehicle that acted suspiciously, and which resembled a vehicle available to a suspect wanted in an attempted murder charge, they acted in a reasonable and appropriate fashion. They apprehended the vehicle and questioned the occupants. It is clear that the Court in *Mitchell* and *Harlow* has instructed District Courts that qualified immunity may be tested by summary judgment motions in order to "permit the resolution of many insubstantial claims on summary judgment and to avoid subjecting government officials either to the costs of trial or to the burdens of broad reaching discovery." *Harlow* at 817, 818, 102 S.Ct. at 2737, 2738; *Mitchell* at ——, 105 S.Ct. at 2815. In accordance with the foregoing, the Court determines that the defendants' Motions for Summary Judgment should be GRANTED, and plaintiffs' Complaint is hereby DISMISSED at plaintiffs' costs.

IT IS SO ORDERED.