978 F.2d 1258
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Samuel CRAMBLIT and Sharon Cramblit, Plaintiffs-Appellants,
v.
Edward FIKSE, Michael Keith Hargis, Fikse Hay Sales, Inc.,
Detective Richard Kratzenberg, Deputy Sheriff
Carroll Adams and Melba Adams,
Defendants-Appellees.
 No. 91-4002.
 United States Court of Appeals, Sixth Circuit.
 Oct. 23, 1992.
 
 Before NATHANIEL R. JONES and SILER, Circuit Judges, and BAILEY BROWN, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Plaintiffs, Samuel Cramblit ("Cramblit") and, his mother, Sharon Cramblit ("Mrs. Cramblit"), appeal from the district court's grant of a directed verdict in favor of the defendants, Deputy Sheriff Carroll Adams ("Deputy Adams") and, his wife, Melba Adams ("Mrs. Adams"). This civil rights action was brought under 42 U.S.C. §§ 1983 and 1988, alleging unreasonable seizure and excessive force in the apprehension of Cramblit by Michael Keith Hargis (an agent of a California bail bondsman) and Deputy Adams, and alleging his mistreatment by Hargis during Hargis' transportation of him to California. For the reasons that follow, we affirm the district court's grant of defendants' motion for directed verdict.
 
 I.
 
 2
 In January, 1989, Cramblit was arrested in San Bernadino County, California for possession of amphetamines. His employer, Eddie Fikse, arranged a $5,000 bail bond for him. Prior to the resolution of the California criminal charges against him, Cramblit left California and returned to his mother's home in Ironton, Ohio.
 
 
 3
 Learning that his bail was in danger of being forfeited, Eddie Fikse hired Michael Keith Hargis ("Hargis") to locate Cramblit and return him to the California court in which his criminal charges were pending. In June, 1989, Hargis traveled to Ironton, Ohio, and having failed to contact Cramblit personally, sought assistance from the Ironton, Ohio, Police Department. The Chief of the Department, William Ackison, declined to assist Hargis, claiming that, since Hargis' documentation did not include a warrant, there was no valid authority for the apprehension of Cramblit in Ohio.
 
 
 4
 The following day, however, Hargis received assistance from Captain Rodney McFarland and Patrolman Jerry Leach of the Ironton, Ohio, Police Department. Captain McFarland instructed Patrolman Leach to assist Hargis in what proved to be a fruitless search for Crambilt at Mrs. Cramblit's house.
 
 
 5
 A few days later, Hargis arrived in Huntington, West Virginia, seeking the assistance of Deputy Adams of the Cabell County Sheriff's Department in returning Cramblit to California. At his first meeting with Deputy Adams, Hargis presented a copy of the bail bond, the notice of bail forfeiture, and a letter authorizing him to act as an agent of the surety, Flores Bail Bonds.
 
 
 6
 Deputy Adams arranged to meet Hargis at a Huntington, West Virginia restaurant on June 20, 1989. At that time, Deputy and Mrs. Adams and Hargis agreed that Mrs. Adams would test drive a car, which Cramblit had for sale, drive it into West Virginia, and have Cramblit pick up the car in Huntington at which time Hargis could apprehend Cramblit.
 
 
 7
 After she obtained Cramblit's car, Mrs. Adams left it in the parking lot of a restaurant in Huntington. She called Cramblit and told him where his car was, claiming that it had broken down. A friend drove Cramblit to the restaurant where his car was parked. After arriving at the parking lot, Deputy Adams, dressed in plainclothes, approached Samuel Cramblit and identified himself as a deputy sheriff. Cramblit began to run and was later caught, tackled and handcuffed by Hargis. With Deputy Adams' assistance, Cramblit was escorted to Hargis' car. Hargis then left Huntington with Cramblit, en route to California, and, Cramblit testified, Hargis mistreated him during this journey. Upon his return to California, the charges against Cramblit were ultimately reduced to a misdemeanor and later dismissed.
 
 
 8
 The Cramblits brought their complaint pursuant to 42 U.S.C. §§ 1983 and 1988, alleging violations of the Fourth, and Fourteenth Amendments to the United States Constitution and state tort law claims. Named as defendants in the First Amended Complaint were: Edward (Eddie) Fikse, Michael Keith Hargis, Fikse Hay Sales, Inc.; Detective Richard Kratzenberg, Captain Rodney McFarland, Patrolman Jerry Leach (of the Ironton, Ohio, Police Department); Deputy Sheriff Carroll A. Adams, John Doe and Richard Roe (of the Huntington, West Virginia, Police Department); and, Melba Adams. Prior to trial, plaintiffs dismissed John Doe and Richard Roe from this action. Hargis was dismissed for failure of plaintiffs to obtain service upon him.
 
 
 9
 The jury trial commenced on August 29, 1991. At the close of plaintiffs' case, the trial court dismissed Fikse Hay Sales, Inc., Melba Adams, and Detective Richard Kratzenberg. At the close of defendants' case, the trial court determined that there was no evidence that a conspiracy existed between Hargis, Deputy Adams and Mrs. Adams with respect to the manner in which Hargis transported Cramblit to California. The court therefore limited plaintiffs' claims to Mrs. Cramblit's § 1983 claim relating to the warrantless search of her home, and to Cramblit's claim of excessive force at the time of his apprehension against Deputy Adams. Given the court's ruling that it would not submit a conspiracy instruction relating to the claimed mistreatment by Hargis during the trip to California, plaintiffs chose not to proceed with the excessive force claim against Deputy Adams.
 
 
 10
 On September 5, 1991, the jury found Captain Rodney McFarland and Patrolman Jerry Leach liable under § 1983 for the search of Mrs. Cramblit's home and judgment was entered.[1] Neither Mrs. Cramblit nor Defendants McFarland and Leach appealed this liability judgment. On October 17, 1991, the Cramblits filed their notice of appeal against Eddie Fikse, Fikse Hay Sales, Inc., Detective Richard Kratzenberg, and Deputy and Mrs. Adams. After the notice of appeal was filed, plaintiffs reached settlements with Eddie Fikse, Fikse Hay Sales, Inc. and Detective Richard Kratzenberg. Deputy and Mrs. Adams are the only appellees remaining in this action.
 
 II.
 
 11
 Plaintiffs appeal from the district court's grant of defendants' motion for a directed verdict. A court may grant a directed verdict only when, without weighing the credibility of the witnesses, the evidence leads to only one reasonable conclusion. Erskine v. Consolidated Rail Corp., 814 F.2d 266, 269 (6th Cir.1987) (en banc). The mere existence of a scintilla of evidence in support of the plaintiff's position is insufficient; there must be evidence on which the jury could reasonable find for the plaintiff. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). As with summary judgment, this court reviews a grant of directed verdict de novo. EEOC v. University of Detroit, 904 F.2d 331, 334 (6th Cir.1990).
 
 
 12
 Cramblit first contends, with respect to his apprehension, that California law governing the appointment and authority of bail bond agents should apply. Defendants counter that West Virginia law should apply and since West Virginia has not statutorily preempted the area, the agent of a bail bondsman acting in West Virginia is entitled to exercise the common law rights of a bail bondsman; therefore, a bail bondsman's agent and someone assisting him need not comply with California's statutory requirements.
 
 
 13
 Under California law, a bail bondsman must follow certain procedures[2] to authorize another person to act in his behalf in arresting a defendant. Cramblit contends that since those procedures were not followed, Hargis was not an authorized agent of a bail bondsman and, therefore, Hargis and Deputy Adams had no right to apprehend him. Cramblit's argument is basically an assertion that the laws of California should govern how and by whom an individual who has jumped bail may be apprehended in the state of West Virginia.
 
 
 14
 Like California, many states have passed laws prescribing how bail bondsmen may conduct business within their respective states. As Cramblit correctly points out, the courts of those states have held that their laws regulating the business and practices of bail bondsmen must be enforced even when in derogation of the common law. See, e.g., O.K. Bonding Co. v. Milton, 579 So.2d 602 (Ala.1991); Poteete v. Olive, 527 S.W.2d 84 (Tenn.1975); Austin v. State of Texas, 541 S.W.2d 162 (Tex.Crim.App.1976). These state court cases, however, involved wholly intrastate facts. The bail bondsmen involved were doing business in the state in question and the apprehension of their principal also took place within that state. They are therefore inapplicable to the present interstate apprehension case.
 
 
 15
 Although California and the other states cited above have chosen to replace the common law regulation of bail bondsmen with their own state statutes, West Virginia has not done so. In the absence of a statute to the contrary, the common law right of a surety to arrest and surrender his principal is set forth by the Supreme Court in Taylor v. Taintor:
 
 
 16
 When bail is given, the principal is regarded as delivered to the custody of his sureties. Their dominion is a continuance of the original imprisonment. Whenever they choose to do so, they may seize him and deliver him up in their discharge; and if that cannot be done at once, they may imprison him until it can be done. They may exercise their rights in person or by agent. They may pursue him into another State; may arrest him on the Sabbath; and if necessary, may break and enter his house for that purpose. The seizure is not made by the virtue of new process. None is needed. It is likened to the rearrest by the sheriff of an escaping prisoner.
 
 
 17
 Taylor v. Taintor, 83 U.S. (16 Wall.) 366, 371 (1873). See also Fitzpatrick v. Williams, 46 F.2d 40 (5th Cir.1931).
 
 
 18
 Although the surety may obtain a bailpiece, in West Virginia a bailpiece is not required. Carr v. Sutton, 74 S.E. 239, 240 (W.Va.1912) ("The statute giving the surety right to bailpiece is but cumulative of his common-law remedy, for without process he has the right to arrest his principal for the purpose of surrendering him as an incident to his engagement."). More recently, a district court in this circuit similarly held that unless there is a state statute to the contrary, the surety has a common law right to apprehend the principal, without the necessity of obtaining a warrant, and the use of agents, necessary force and pursuit into another state is expressly permitted. Maynard v. Kear, 474 F.Supp. 794, 802 (N.D.Ohio 1979). The only limitation on the common law right of recapture is that the force used during the recapture be reasonably necessary to effectuate the apprehension. Id.
 
 
 19
 At his first meeting with Deputy Adams, Hargis presented him with a copy of the bail bond, a copy of the notice of bond forfeiture, and a copy of a letter from Flores Bail Bonds giving Hargis, as agent, authority to apprehend Cramblit. Since West Virginia has not statutorily abrogated the common law rights of a bail bondsman, the documents presented by Hargis were valid authorization for him and Deputy Adams to apprehend Cramblit. In West Virginia, the bail bondsman or his agent may apprehend the principal without resort to the court system and return the principal to the jurisdiction where the criminal charges are pending.
 
 III.
 
 20
 Cramblit next contends that several provisions of West Virginia Code were violated following his apprehension. Specifically, Cramblit contends that § 5-1-9 of the West Virginia Code required Deputy Adams and Hargis to present Cramblit to a magistrate after they apprehended him.[3] That section, however, is part of West Virginia's Uniform Criminal Extradition Act.[4] Reliance on this act confuses the law of extradition with the law of bail. This distinction was clearly defined by the Fifth Circuit in Fitzpatrick v. Williams, 46 F.2d 40 (5th Cir.1931). The court explained:
 
 
 21
 The right of the surety to recapture his principal is not a matter of criminal procedure, but arises from the private undertaking implied in the furnishing of the bond. It is not a right of the state but of the surety. If the state desires to reclaim a fugitive from its justice, in another jurisdiction, it must proceed by way of extradition in default of a voluntary return. It cannot invoke the right of a surety to seize and surrender his principal, for this is a private and not a governmental remedy. It is equally true that the surety, if he has the right, is not required to resort to legal process to detain his principal for the purpose of making surrender. There is no conflict between the two rights. Extradition can only be exercised by a government at the request of a government. Surrender by bail can be exercised only by the individual, who is bail.
 
 
 22
 Id. at 40-41. The State of California made no demand for the return of Cramblit. West Virginia's version of the Uniform Criminal Extradition Act therefore does not apply. Hargis, acting upon a private contract, was entitled to apprehend Cramblit and return him to California. Since Cramblit was not being extradited to California, but, instead, was being apprehended by a representative of his surety, Deputy Adams was not required to follow the procedures set out in § 5-1-9 of the West Virginia Code.
 
 
 23
 Cramblit next contends that several other sections of the West Virginia Code, which require an arresting officer to bring an arrested person before a judge or magistrate, were violated when he was apprehended.[5] These sections, however, simply state the procedures West Virginia police officers must follow in making arrests within the state, and have no relevance to the present case since Cramblit was apprehended by his surety's agent in that capacity, not arrested.
 
 
 24
 Finally, Cramblit attempts to fit this case within the perimeters of West Virginia Code § 62-1C-14, which provides that:
 
 
 25
 A bailpiece is a certificate stating that the bail became such for the accused in a particular case and the amount thereof. Upon demand therefor, the court, justice or clerk shall issue to the surety a bailpiece. Any officer having authority to execute a warrant of arrest shall assist the surety holding such bailpiece to take the accused into custody and produce him before the court or justice. The surety may take the accused into custody and surrender him to the court or justice without such bailpiece.
 
 
 26
 W.Va.Code § 62-1C-14 (1985). That provision, however, does not contemplate the situation of a foreign bail bondsman apprehending his principal in West Virginia and therefore applies only to intrastate bailbond situations. With no statutory provision to the contrary, a foreign bail bondsman and agent retain all common law rights for the purpose of arresting his principal in West Virginia. Carr v. Sutton, 74 S.E. 239, 240 (W.Va1912).
 
 
 27
 Cramblit correctly asserts that violation of a state extradition law can support a § 1983 cause of action. See, e.g., Brown v. Nutsch, 619 F.2d 758 (8th Cir.1980) (failure to comply with state extradition statute actionable under 42 U.S.C. § 1983); McBride v. Soos, 594 F.2d 610 (7th Cir.1979) (removal of plaintiff from Missouri to Indiana by Indiana law enforcement officials without compliance with extradition statute stated cause of action based on 42 U.S.C. § 1983); Wirth v. Surles, 562 F.2d 319 (4th Cir.1977), cert. denied, 435 U.S. 933 (1978) (law enforcement officials must comply with state extradition statutes in apprehending fugitives, therefore fugitive had cause of action under 42 U.S.C. § 1983); Sanders v. Conine, 506 F.2d 530 (10th Cir.1974) (failure of law enforcement officials to comply with state extradition statute gives plaintiff cause of action based upon 42 U.S.C. § 1983). The state law violations involved in these cases alone, however, would not support a § 1983 action. Instead, such an action is maintainable either because the state law was designed to implement the extradition clause of the United States Constitution or because an independent violation of the Fourth or Fourteenth Amendment was involved. As discussed above, however, since California did not request extradition of Cramblit and therefore West Virginia extradition laws were not applicable, those statutes were not violated.
 
 IV.
 
 28
 Cramblit next contends that he presented a cause of action under § 1983 in that his Fourth and Fourteenth Amendment rights were violated because there was a false arrest and imprisonment under state law. While it is true that a false arrest or imprisonment may be the basis for a claim under § 1983 for violation of the Fourth and Fourteenth Amendments, the fact that there has been such a state law violation does not, ipso facto, create such a cause of action under § 1983. Baker v. McCollan, 443 U.S. 137 (1979); Braley v. City of Pontiac, 906 F.2d 220 (6th Cir.1990). In any event, since we have determined that, under the applicable law, i.e., West Virginia law, the conduct of Deputy and Mrs. Adams was not unlawful, the claimed state law violation could not be the basis for a claim under § 1983.
 
 V.
 
 29
 Cramblit next contends that he presented enough evidence to allow him to maintain a § 1983 conspiracy claim against Deputy and Mrs. Adams. Under Cramblit's theory, he could recover for harm inflicted by Hargis during the return trip to California. To recover under his theory, Cramblit would have to prove that Hargis conspired with Deputy and Mrs. Adams or acted in concert to deprive him of his constitutional rights. The standard for proving such a civil conspiracy was set forth by this court in Hooks v. Hooks, 771 F.2d 935 (6th Cir.1985):
 
 
 30
 A civil conspiracy is an agreement between two or more persons to injure another by unlawful action. Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. Each conspirator need not have known all of the details of the illegal plan or all of the participants involved. All that must be shown is that there was a single plan, that the alleged co-conspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant.
 
 
 31
 Id. at 943-44.
 
 
 32
 There is no dispute that both Deputy and Mrs. Adams agreed to assist Hargis in apprehending Cramblit. That apprehension, however, was not unlawful under West Virginia law, and the district court properly held that such was not an illegal conspiracy. Moreover, there was no evidence that Deputy and Mrs. Adams conspired with Hargis with respect to the manner in which Hargis transported Cramblit to California. As such, Deputy Adams' liability could only be based on the use of excessive force in Cramblit's apprehension. Since Cramblit voluntarily dismissed the excessive force claim against Deputy Adams, no federal claims remained to be submitted to the jury.
 
 VI.
 
 33
 Finally, we need not reach Cramblit's contention that his mother should have been allowed to maintain a derivative action against Deputy Adams for the alleged violations of his constitutional rights. Since Cramblit does not have a viable § 1983 claim, neither does his mother. We note in passing, however, that an action under 42 U.S.C. § 1983 inures only to the benefit of one whose own personal constitutional rights were violated. Coon v. Ledbetter, 780 F.2d 1158 (5th Cir.1986) (bystander cannot recover for witnessing violation of the civil rights of another); Hall v. Wooten, 506 F.2d 564 (6th Cir.1974) (one cannot sue for the deprivation of the civil rights of another); Jenkins v. Carruth, 583 F.Supp. 613 (E.D.Tenn.1982), aff'd, 734 F.2d 14 (6th Cir.1984) (husband cannot sue for the alleged deprivation of his wife's civil rights); Pierce v. Stinson, 493 F.Supp. 609 (E.D.Tenn.1979) (parents cannot maintain an action under 42 U.S.C. § 1983 for the alleged deprivation of their children's civil rights).
 
 VII.
 
 34
 For the foregoing reasons, we affirm the district court's grant of a directed verdict in favor of defendants Deputy and Mrs. Adams.
 
 
 
 [1]
 Mrs. Cramblit was awarded the sum of $1 for compensatory damages and the sum of $1 for punitive damages
 
 
 [2]
 Section 1301 of the California Penal Code reads in relevant part:
 For the purpose of surrendering the defendant, the bail or any person who has deposited money or bonds to secure the release of the defendant, at any time before such bail or other person is finally discharged, and at any place within the state, may himself arrest defendant, or by written authority indorsed on a certified copy of the undertaking or a certified copy of the certificate of deposit, may empower any person of suitable age to do so.
 Cal. [Penal] Code § 1301 (West 1988) (emphasis added).
 
 
 [3]
 West Virginia Code § 5-1-9(e) states that:
 The arrest of a person may be lawfully made also by any officer or a private person, without a warrant, upon reasonable information that the accused stands charged in the courts of a state with a crime punishable by death or by imprisonment for a term exceeding one year, but when so arrested the accused must be taken before a judge or justice with all practicable speed and complaint must be made against him under oath setting forth the ground for the arrest as in the preceding section [subsection (d) of this section]; and thereafter his answer shall be heard as if he had been arrested on a warrant.
 W.Va.Code § 5-1-9(e) (1985).
 
 
 [4]
 Section 5-1-13 of the West Virginia Code states that "[s]ections seven to thirteen [§§ 5-1-7 to 5-1-13] of this article may be cited as the 'Uniform Criminal Extradition Act.' " W.Va.Code 5-1-13 (1985)
 
 
 [5]
 Specifically, Cramblit relies on: W.Va.Code § 62-10-9 (1985), which authorizes sheriffs and their deputies to make arrests within their respective counties for any crime for which a warrant has been issued, and without a warrant for crimes committed in their presence; W.Va.Code § 62-1-5 (1985), which requires officers making an arrest to take the person arrested without unnecessary delay before a magistrate of the county in which the arrest was made; W.Va.Code §§ 62-11-1--62-11-5 (1985), which permit a peace officer from another state engaged in the fresh pursuit of a person into West Virginia to arrest the person, provided that, without unnecessary delay, the peace officer brings the arrested person before a magistrate of the county in which the arrest was made; and Ohio Revised Code Ann. § 2935.29--.35 (Baldwin 1982), which requires a foreign arresting officer to bring the arrested person before a local Ohio magistrate