987 F.2d 723
 KEY WEST HARBOUR DEVELOPMENT CORPORATION, a Florida
Corporation, Plaintiff-Appellant,
v.
CITY OF KEY WEST, FLORIDA, Tom Sawyer, Mayor of the City of
Key West, George Halloran, Salley Lewis, Jimmy Weekly,
individually and in their official capacities as City
Commissioners, The Key West Redevelopment Agency, Charles
Majors, Chairman of the Key West Redevelopment, Lou
Hernandez, Treasurer of the Key West Development Agency, Bob
Kruse, Vice Chairman of the Key West Redevelopment Agency,
individually and in their official capacities, Defendants-Appellees.
 No. 92-4038.
 United States Court of Appeals,
Eleventh Circuit.
 April 2, 1993.
 
 Joel Hirschhorn, Coral Gables, FL, for plaintiff-appellant.
 Michael T. Burke, Ft. Lauderdale, FL, for defendants-appellees.
 Appeal from the United States District Court for the Southern District of Florida.
 Before HATCHETT and BLACK, Circuit Judges, and DYER, Senior Circuit Judge.
 HATCHETT, Circuit Judge:
 
 
 1
 The main questions presented in this case are whether the appellant, a developer, had a constitutionally protected property interest to redevelop the Harry S. Truman Annex Naval Base in Key West, Florida, ("Annex"), and if so, whether the appellees deprived the appellant of those constitutionally protected property interests without due process of law. Answering the first question in the negative, we affirm the district court.
 
 I. FACTS
 
 2
 In 1973, the General Services Administration ("GSA") offered to sell the Harry S. Truman Annex Naval Base in Key West, Florida. The City of Key West ("City"), appellee, expressed an interest in purchasing the Annex.
 
 
 3
 On March 19, 1979, the Key West City Commission ("Commission"), and individual appellees, passed Resolution 79-41, which acknowledged that redeveloping the Annex was in the interest of the City and further recognized the need for a community redevelopment agency to supervise the redevelopment of the Annex. On May 7, 1979, the Commission passed Ordinance 79-15, which created the Key West Redevelopment Agency ("Agency") to supervise the redevelopment of the Annex pursuant to the Community Redevelopment Act of 1969[1] ("Act").
 
 
 4
 On June 18, 1979, the Commission passed an ordinance amending Ordinance 79-15, which appointed the Agency as the City's agent to acquire the Annex. In January, 1980, the Agency and an independent consultant prepared and published the "Revised Conceptual Plan for the Redevelopment of the Truman Annex, Key West, Florida" ("Conceptual Plan"). On March 3, 1980, in Resolution 80-30, the Commission approved and adopted the Conceptual Plan.
 
 
 5
 During the fall of 1980, the Agency chose the Key West Harbour Development Corporation ("KWHDC"), appellant, to perform the Annex predevelopment services. In October, 1980, KWHDC began performing these predevelopment services for the Agency. In July, 1981, the Florida Legislature abolished and recreated the Agency in Ch. 405, 1981 Fla.Laws 144.
 
 
 6
 On July 16, 1982, KWHDC and the Agency executed an agreement which, among other things, designated KWHDC as master developer of the Annex redevelopment project. On May 29, 1984, KWHDC and the Agency executed the "Disposition and Development Agreement." Under this agreement, the Agency would purchase the Annex with funds advanced from KWHDC; in exchange, the Agency would grant KWHDC a ninety-nine year lease on the Annex. On September 5, 1984, the Commission adopted Ordinance 84-32, which created a "Planned Redevelopment District" to accommodate the redevelopment of the Annex. On June 4, 1985, the City passed Resolution 85-107, which allowed the City to enter into the "Key West Harbour Project Agreement." In June, 1985, the Commission, the Agency, KWHDC, and the State of Florida Department of Community Affairs ("DCA") entered into this undated agreement. The Key West Harbour Project Agreement provided the procedures for the City to review the redevelopment of the Annex.
 
 
 7
 On July 18, 1985, the Agency officially offered to purchase the Annex from GSA for $13.8 million. On September 24, 1985, the GSA accepted the offer and scheduled the closing for March 31, 1986.
 
 
 8
 On January 7, 1986, in Ordinance 86-2, the Commission imposed a 180-day moratorium on the issuance of building permits for any building, project, development, or structure to evaluate the City's estimated growth projections. On February 7, 1986, KWHDC requested an opportunity to speak at the February 18 commission meeting and further requested assurances that the moratorium would not delay continued development of the Annex under the existing laws and ordinances after the moratorium expired. On February 18, 1986, the Commission adopted Resolution 86-49, which requested that GSA delay the proposed sale and transfer of the Annex for ninety days while the City evaluated the proposed purchase and transfer. During this time, the City also published a notice for a special commission meeting and workshop regarding the Annex. On February 25, 1986, in Resolution 86-58, the Commission arguably rescinded its approval of the Conceptual Plan. On March 11, 1986, the Commission passed Resolution 86-76, which explained that Resolution 86-58 was a modification, not a rescission, and requested that the Agency recommend amendments to the Conceptual Plan to reflect the City's current needs.
 
 
 9
 On March 14, 1986, KWHDC informed the Agency that it would no longer perform because of Resolution 86-58, and that it may require the Agency to reimburse it for predevelopment services. The Agency requested that KWHDC comply with the Disposition and Development Agreement, but it refused. GSA declared the Agency in breach of the Annex Purchase and Sale Agreement.
 
 
 10
 In September, 1986, GSA sold the property to another developer for $17.2 million. Four years later, KWHDC sued for damages.II. PROCEDURAL HISTORY
 
 
 11
 On February 22, 1990, the appellant filed a complaint in the district court alleging a constitutional violation under 42 U.S.C. § 1983 ("Count I"), conspiracy to deprive the appellant of its rights without due process of law ("Count II"), breach of contract ("Count III"), and tortious interference with a business relationship ("Count IV"). On March 27, 1990, the appellees (the City and the Commission) filed a motion to dismiss the complaint for failure to state a federal claim and lack of subject matter jurisdiction over the pendent state claims. The district court denied the motion to dismiss in Key West Harbour Development Corp. v. City of Key West, Florida, 738 F.Supp. 1390 (S.D.Fla.1990). On June 8, 1990, the appellees answered the complaint.
 
 
 12
 On February 26, 1991, the appellant filed a motion for partial summary judgment; on March 8, 1991, the appellees filed a motion for summary judgment. The district court held a hearing on May 31, 1991. On December 16, 1991, the district court granted the appellees' motion for summary judgment and denied the appellant's motion for partial summary judgment in Key West Harbour Development Corp. v. City of Key West, Florida, No. 90-10027 (S.D.Fla.1990).
 
 III. CONTENTIONS
 
 13
 The appellant contends that the three agreements coupled with the Community Redevelopment Act provided it with a protected property interest pursuant to 42 U.S.C. § 1983. Hence, the appellant asserts that the Commission deprived it of those property interests without due process of law when it rescinded the Conceptual Plan without a public hearing and proper notice. Additionally, the appellant contends that the appellees' adoption of Resolution 86-58 rescinding the Conceptual Plan constituted a breach of contract. Furthermore, the appellant contends that neither absolute legislative nor qualified immunity is available to shield the individual appellees from liability for their wrongful actions of rescinding the Conceptual Plan without a hearing and notice.
 
 
 14
 The appellees contend that the appellant did not have a protected property interest to redevelop the Annex because the appellant did not own, lease or have a contract to buy the Annex; consequently, the appellees did not deprive the appellant of any alleged property interests without due process of law. Moreover, the appellees contend that the appellant fails to show how Resolution 86-58 breached any of the agreements. Lastly, the appellees contend that the individual appellees have absolute legislative immunity because they acted in a legislative capacity; in the alternative, they have qualified immunity because in February, 1986, it was not clearly established that the appellant had a constitutionally protected property interest; thus, no reasonable official would have known that the adoption of Resolution 86-58 would violate any constitutional right of the appellant.
 
 IV. ISSUES
 
 15
 To determine whether the district court erred in granting summary judgment, we must decide whether the appellant had a constitutionally protected property interest to redevelop the Annex, and if so, whether the appellees deprived the appellant of those constitutionally protected property interests without due process of law. Additionally, we must decide whether the appellees breached any agreement with the appellant. Finally, we must consider whether absolute legislative or qualified immunity shields the individual appellees from liability.
 
 V. STANDARD OF REVIEW
 
 16
 On appeal, a grant of summary judgment is subject to de novo review. MacKenzie v. City of Rockledge, 920 F.2d 1554, 1558 (11th Cir.1991). We review the evidence and all factual inferences in the light most favorable to the nonmoving party to determine whether any genuine issue of material fact exists and whether the moving party is entitled to judgment as a matter of law. MacKenzie, 920 F.2d at 1558. We find no genuine issues of material fact. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, we must decide whether the district court's determinations were proper as a matter of law. See West v. Greyhound Corp., 813 F.2d 951, 954 (9th Cir.1987).
 
 VI. DISCUSSION
 A. Property Interest
 
 17
 To establish a violation of procedural due process under 42 U.S.C. § 1983, a plaintiff must prove (1) that some person deprived him of a federal right and (2) that the person who deprived him of that right acted under color of state law. Gomez v. Toledo, 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980). "The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits." Board of Regents v. Roth, 408 U.S. 564, 576, 92 S.Ct. 2701, 2708, 33 L.Ed.2d 548 (1972). For an individual to have a property interest, the individual must have a legitimate claim of entitlement to the property interest. Roth, 408 U.S. at 577, 92 S.Ct. at 2709. Property interests "are defined by existing rules or understandings...." Roth, 408 U.S. at 577, 92 S.Ct. at 2709.
 
 
 18
 The first inquiry for section 1983 is whether the defendant deprived the plaintiff of a constitutionally protected property right. Economic Development Corp. v. Stierheim, 782 F.2d 952, 953-54 (11th Cir.1986); Baker v. McCollan, 443 U.S. 137, 140, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433 (1979); Marine One, Inc. v. Manatee County, 877 F.2d 892, 894 (11th Cir.1989). State law defines the parameters of a plaintiff's property interest for purposes of section 1983. Paul v. Davis, 424 U.S. 693, 709, 96 S.Ct. 1155, 1164, 47 L.Ed.2d 405 (1976); Marine One, Inc., 877 F.2d at 894. Whether Florida law has created a property interest is a legal question for the court to decide. Marine One, Inc., 877 F.2d at 894; MacKenzie, 920 F.2d at 1559.
 
 
 19
 Under Florida law, a statute, ordinance, contract, policies and practices of an institution which support claims of entitlement may create a property interest. Metropolitan Dade County v. Sokolowski, 439 So.2d 932, 934 (Fla. 3d D.C.A. 1983) (citing Bishop v. Wood, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976) (recognizing that an ordinance, statute or contract may create a property interest) and Perry v. Sinderman, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (recognizing that policies and practices of an institution which support claims of entitlement may create a property interest)). The existence of an enforceable contract with a state or local government entity does not give rise to a constitutionally protected property interest. See Economic Development Corp., 782 F.2d 952 (finding that plaintiff's contract with the county failed to afford it a constitutionally protected property interest); Medical Laundry Services v. University of Alabama, 906 F.2d 571, 573 (11th Cir.1990) (finding that an enforceable contract with the state does not constitute a federally protected property interest); Braden v. Texas A & M University, 636 F.2d 90, 93 (5th Cir. Unit A Feb. 1981) (holding that a mere breach of contract does not give rise to a constitutionally protected property interest; rather plaintiff must predicate relief on a deprivation of a constitutional right).[2]
 
 
 20
 The appellant does not assert that the existence of the agreements itself gives rise to a constitutionally protected property interest; rather, the appellant contends that the three agreements coupled with the Act provided it with a protected property interest pursuant to 42 U.S.C. § 1983. Thus, we must review the Act to determine whether it vests the appellant with a property right in the agreements.
 
 
 21
 Generally, the Act provides a comprehensive system for counties and municipalities to redevelop blighted and slum areas where such redevelopment is necessary for the public interest. §§ 163.335, 163.355. To effectuate the Act's purposes, the legislature conferred powers to the county or municipality. §§ 163.335, 163.355. If a county or municipality determines that redevelopment is necessary, it must adopt a resolution finding that blighted or slum areas exist and that redevelopment is necessary. § 163.355. Thereafter, it may create a community redevelopment agency. § 163.356. The redevelopment agency then has the "powers necessary or convenient to carry out and effectuate the purposes and provisions" of the Act; however, the county or municipality retains the power of final approval of the community redevelopment plan and modifications thereof. § 163.358. The county, municipality, agency, or any public or private person or agency may prepare a community redevelopment plan and submit it to the agency; then, after the agency has chosen a plan to recommend to the governing body for approval, it must submit the plan to the governing body who may approve the project after a public hearing.[3] § 163.360. If the governing body approves the community redevelopment plan, the plan is deemed to be in full force, and the county or municipality may authorize the agency to effectuate the plan or modification in accordance with its terms. § 163.360. Upon the sale or lease of the real property in the community redevelopment area, modification of the plan may be conditioned upon the approval of the owners, lessees, or successors in interest and subject to their rights. § 163.361.
 
 
 22
 In this case, the Florida Legislature created the Agency pursuant to the Act. The appellant claims that its "entitlement" to develop the property in substantial conformity with the Conceptual Plan arises from the Act, but nothing in the Act confers a property interest upon the appellant. Under Florida law, statutory procedures alone do not create protected property interests. See, e.g., Kelly v. Gill, 544 So.2d 1162, 1164-65 (Fla. 5th D.C.A. 1989) (finding that a state statute that requires minimal procedural steps before termination will not in and of itself create a property interest in continued employment), cert. denied, 494 U.S. 1029, 110 S.Ct. 1477, 108 L.Ed.2d 614 (1990).
 
 
 23
 For support of its contentions, the appellant refers this court to Pataula Electric Membership Corp. v. Whitworth, 951 F.2d 1238 (11th Cir.), cert. denied sub nom., Georgia Power Co. v. Pataula Electric Membership Corp., --- U.S. ----, 113 S.Ct. 302, 121 L.Ed.2d 225 (1992). In Pataula Electric, Pataula filed at 42 U.S.C. § 1983 action alleging that Georgia's Department of Corrections failed to award the contract to the lowest responsible bidder. The district court dismissed the claim for failure to state a cause of action because it found that Pataula did not have a property interest under 42 U.S.C. § 1983. On appeal, this court found that, "A disappointed bidder may have a constitutionally protected property interest in the award of a contract under 42 U.S.C. § 1983 (1981) if that interest is acknowledged by 'existing rules or understandings that stem from an independent source such as state law.' " Pataula Electric, 951 F.2d at 1242 (citing Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972)).
 
 
 24
 Pataula Electric, however, involved the Georgia State Purchasing Act, which the Georgia Vendor Manual interpreted to require that the overseeing state agency award contracts to the lowest responsible bidder. Pataula Electric, 951 F.2d at 1241. The court in Pataula Electric found that the Georgia Vendor Manual contained directives sufficient to create an entitlement to a contract if the bidder was the lowest responsible bidder. Pataula Electric, 951 F.2d at 1242. In this case, however, we find that the Act fails to provide similar directives. Rather, we find that the Act allows the Agency and the City broad discretion to choose the community redevelopment plan. See § 163.360.[4]
 
 
 25
 Instead, this case is most analogous to Striton Properties, Inc. v. City of Jacksonville Beach, 533 So.2d 1174 (Fla. 1st D.C.A.), review denied, 544 So.2d 201 (Fla.1988). In Striton Properties, Striton, the plaintiff developer, contended that it acquired vested property rights to redevelop the area because of (1) the redevelopment agency's advertising for redevelopment bids, (2) Striton's submission of an offer, (3) the redevelopment agency's acceptance of the offer by resolution, (4) Striton's and the redevelopment agency's negotiation of the specific wording of the Disposition and Development Agreement, and (5) the redevelopment agency's approval of that agreement by resolution. Striton Properties, 533 So.2d at 1178.
 
 
 26
 In Striton Properties, the defendant City designated an area as a community redevelopment area pursuant to the Act. The City later created a community redevelopment agency to redevelop the area. Striton and the redevelopment agency entered into a Planning and Development Agreement which designated Striton as master developer of the property and set forth the procedures for the preparation of the redevelopment plan. Striton Properties, 533 So.2d at 1176. Pursuant to the agreement, Striton and the redevelopment agency prepared a conceptual development plan, which they submitted to the City. The City initially declined to approve the plan after a public hearing. Striton Properties, 533 So.2d at 1177. Subsequently, the City approved a revised plan by resolution; however, the City amended the resolution to direct that the redevelopment agency only redevelop "Phase I" of the area. Striton Properties, 533 So.2d at 1177. Striton reserved its alleged rights under the Planning and Development Agreement and submitted a bid for Phase I, which the redevelopment agency accepted. Striton Properties, 533 So.2d at 1177.
 
 
 27
 Striton and the redevelopment agency then negotiated the Disposition and Development Agreement for Phase I. The City, however, disapproved of this agreement before any party executed it and had a substitute agreement prepared. Striton Properties, 533 So.2d at 1177. The redevelopment agency declined to accept the City's substitute agreement; thus, the City asked for the resignations of the redevelopment agency's members and adopted a resolution rescinding its approval of the Community Redevelopment Plan for Phase I. Striton Properties, 533 So.2d at 1177.
 
 
 28
 The First District Court of Appeal of Florida discounted Striton's reliance upon the Disposition and Development Agreement because the City, the redevelopment agency, or Striton never executed the agreement. Striton Properties, 533 So.2d at 1178. Moreover, the court found that neither the agreement nor the parties' interactions leading up to the agreement could divest the City of its exclusive power to grant final approval of the community redevelopment plan pursuant to section 163.358. Striton Properties, 533 So.2d at 1178.
 
 
 29
 Although this case differs from Striton Properties because here the appellant and the Agency executed several agreements, we reiterate that the only agreement which the appellees signed states that the appellant would acquire no vested property rights. Specifically, Paragraph V(b) of the Key West Harbour Project Agreement states: "By approval of this Agreement, [KWHDC] and its successors and assigns shall acquire no rights or approvals, vested or otherwise, as to the [Agency], the City, and DCA except as to paragraph IV(b)(1), to develop the subject property in a certain manner or under a certain plan...."[5] Hence, the appellant did not acquire a property interest to redevelop the Annex. We need not further address the 42 U.S.C. § 1983 claim.
 
 B. Breach of Contract
 
 30
 The appellant argues that the appellees' adoption of Resolution 86-58 breached the three agreements. We disagree. The July 16, 1982 and the May 29, 1984 agreements designated the appellant as master developer for the Annex and provided the method of purchasing the Annex from GSA. The undated Key West Harbour Project Agreement, the only one in which the appellees and the appellant were signatories, recognized that the appellees had primary review of the project, and provided the method of reviewing proposals to develop the property, if the Agency acquired the property and the appellant proceeded with the project. These agreements did not confer rights upon the appellant to redevelop the annex. Consequently, we find that the district court correctly ruled that the appellees' adoption of Resolution 86-58 did not breach any of the agreements.[6]
 
 VII. CONCLUSION
 
 31
 For the foregoing reasons, we hold that the three agreements coupled with the Act failed to afford the appellant a constitutionally protected property interest. Additionally, we hold that the appellees' adoption of Resolution 86-58 did not breach any of the agreements. Accordingly, we affirm the district court's order granting summary judgment on behalf of the appellees.
 
 
 32
 AFFIRMED.
 
 
 33
 Ch. 305, 1969 Fla.Laws 1075 (codified as amended at Fla.Stat. §§ 163.330-.450 (1992)).
 
 
 
 [2]
 In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the court adopted as binding precedent all decisions of the former Fifth Circuit, including Unit A, handed down prior to October 1, 1981
 
 
 [3]
 " 'Governing body' means the council or other legislative body charged with governing the county or municipality." § 163.340(3)
 
 
 [4]
 The appellant also refers this court to Villas of Lake Jackson, Ltd. v. Leon County, 796 F.Supp. 1477 (N.D.Fla.1992). Villas of Lake Jackson recognizes that Florida law purports to recognize a protected property interest when a landowner makes a substantial change in position or incurs extensive obligations and expenses in good faith reliance upon a governmental omission or action. Villas of Lake Jackson, 796 F.Supp. at 1488-89. But we find Villas of Lake Jackson factually distinguishable from this case. The court decided Villas of Lake Jackson on a motion to dismiss, and the complaint, which the court accepted as true, stated that the county conceded that the landowner had vested rights to complete the project as planned and that the landowner detrimentally relied on these assurances. In this case, the only agreement that the appellees signed clearly stated that the appellant would not acquire vested property rights to redevelop the property. Moreover, unlike in Villas of Lake Jackson, this appellant was not the owner of the Annex, but solely a developer hoping to redevelop the Annex. Hence, Villas of Lake Jackson fails to support the appellant's assertion that it has a constitutionally protected property right to redevelop the property
 
 
 [5]
 Paragraph IV(b)(1) states:
 
 
 [1]
 DCA approves of, and acknowledges that Phase One land uses are consistent with the 'Boundary and Principles for Guiding Development for the Florida Key Area of Critical State Concern' in 27F-8, F.A.C. DCA will not contest a rezoning of the Project property to Planned Redevelopment District pursuant to Ordinance 84-32. DCA may contest a City development order or permit approving the Phase One uses if DCA believes the uses are being implemented contrary to the 27F-12, F.A.C., 'Land Planning Regulations for the Florida Keys Area of Critical State Concern, City of Key West.'
 
 
 [6]
 In light of our holding, we need not address the question of immunity