NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 09-4499
_____

JEANNE PHILLIPS,
Administrator of the Estate of Mark Phillips, deceased,

Appellant

v.

NORTHWEST REGIONAL COMMUNICATIONS;
DANIEL NUSSBAUM; DANIELLE TUSH; BRIAN CRAIG
_____

On Appeal From the United States District Court
for the Western District of Pennsylvania
(Civil No. 05-cv-1502)
District Judge:  Honorable William L. Standish

Submitted Under Third Circuit LAR 34.1(a)
June 10, 2010
_____

Before:  AMBRO, CHAGARES, and GREENAWAY, JR., Circuit Judges.

(Filed: August 20, 2010)
_____

OPINION
_____

CHAGARES, Circuit Judge.

This heartrending case returns for our review following the District Court's grant

of the defendants' motion for summary judgment.  In Phillips v. County of Allegheny,

515 F.3d 224 (3d Cir. 2008) ("Phillips I"), we reversed in part the District Court's dismissal of Jeanne Phillips's complaint alleging that several defendants facilitated the death of her son. On remand, the District Court concluded that the evidence fails to support Phillips's remaining claims as a matter of law. We will affirm.

I.

We write solely for the benefit of the parties and therefore recount only the essential facts. On October 29, 2003, Michael Michalski – upset that his employment at Northwest Regional Communications ("Northwest") had been terminated – shot and killed Gretchen Ferderbar (his estranged girlfriend), Mark Phillips (Ferderbar's new boyfriend), and Ferderbar's sister. This case concerns the defendants' alleged actions and inactions in the days leading up to the murders.

At all times relevant here, Northwest was a non-profit governmental corporation established to route emergency calls to appropriate first-responders in western Pennsylvania. To that end, its dispatchers provided – and thus had access to – certain confidential information gleaned from the databases of various law enforcement agencies.[1] Using electronic and hand-held maps, Northwest dispatchers also were able to provide directions to those to whom they routed calls. Daniel Nussbaum, Northwest's Communications Director, established a policy under which dispatchers could – and,

---

[1] This confidential information included citizens' names, addresses, dates of birth, Social Security numbers, driver's license information, motor vehicle registration information, and criminal histories.

when able, were required to – give directions to a particular address to anyone who called asking for them (so long as the caller already had the address). As such information is publicly available, Nussbaum considered this to be a complimentary service.

Michalski had been employed as a dispatcher at Northwest since late 2000, and had been in involved in a turbulent relationship with Ferderbar since about that time. Michalski was, by all accounts, a volatile, antagonizing, and potentially violent man, and was prone to harassing his co-workers and others. On several occasions, Northwest dispatchers Danielle Tush and Brian Craig had seen Michalski become angry and verbally abusive with Ferderbar on the phone, but they had never seen him physically assault her.

In October 2003, Michalski began to suspect that Ferderbar had begun dating another man. On October 12, he ran an unauthorized search on Northwest's databases seeking the vehicle identification number ("VIN") on all vehicles registered under his name. Specifically, he sought the VIN of a Pontiac Grand Am that he owned jointly with Ferderbar (but which Ferderbar possessed exclusively). According to Michalski, the VIN would have enabled him to obtain a spare key so that he could recover the vehicle if he confirmed that Ferderbar had begun dating someone else.

Nussbaum learned of Michalski's unauthorized search from another employee the next day. He met with Michalski on October 15 and placed him on a one-week suspension to take place from October 27 through November 2. The suspension never took effect, however, due to apparent scheduling difficulties, and Michalski was

3

permitted to work during that time. Notwithstanding the obvious breach of Northwest policy – of which Tush and Craig were aware – Nussbaum placed no restrictions on Michalski's database search capabilities, nor did he monitor Michalski's search activity.

On October 19, Michalski came to work with blood on his pants, boasting that he had "found that guy that Gretchen has been going out with . . . and . . . beat him up." Appendix ("App.") 256. Tush and Craig learned of the incident between Michalski and another man, but they did not know the man's identity.

On October 26, aware that further violations of Northwest's database search policies would result in termination of his employment, Michalski ran a second unauthorized search, this time seeking the address of Phillips's residence. Nussbaum testified at his deposition that he did not learn of the second search until the day of the murders, and Tush and Craig testified that they did not learn of it until afterward.

On October 28, Michalski had several combative telephone conversations with Ferderbar while he was at work, and he thereafter refused to answer any emergency calls. Nussbaum – who was present during this "rage" – took no action in response, characterizing Michalski as merely "having a bad day." App. 259.5.

At 8:57 p.m. that evening, Michalski called a non-emergency Northwest telephone line and spoke with Tush. He asked Tush to give him directions to 633 Edward Drive in Carnegie, Pennsylvania, but refused to say whose address it was or why he wanted directions. Tush provided the directions. After doing so, she commented to him that she

4

"probably [had just] aided and abetted some sort of felony." App. 306. Michalski did not mention Phillips by name during his conversation with Tush, nor did he intimate that Ferderbar's new boyfriend lived at 633 Edward Drive.

Early in the morning on October 29, Ferderbar returned from a West Virginia casino with Phillips, and she parked the Grand Am at his house. At 2:13 a.m., Michalski again called Northwest, and this time spoke with Craig. He again asked for directions to 633 Edward Drive, and rebuffed Craig's query why he needed them. Craig then asked Michalski to call him on his cell phone (instead of a Northwest telephone line), and he ultimately provided the directions. But Craig refused to give Michalski the telephone number at 633 Edward Drive. Craig testified at his deposition that, at the time of this conversation, he believed that Michalski was trying to locate either Ferderbar or the Grand Am. Michalski did not mention Phillips by name during his recorded conversation with Craig, nor did he intimate that Ferderbar's new boyfriend lived at 633 Edward Drive.

Shortly after speaking with Craig, Michalski arrived at 633 Edward Drive and found the Grand Am parked in the driveway, thus confirming his suspicion that Phillips and Ferderbar had begun dating. He commandeered the car, drove fourteen miles to his mother's house in Shaler, Pennsylvania, and went to bed. Stranded, Ferderbar spent the night at Phillips's house. The next morning, she called Nussbaum to inform him that Michalski had taken her car from Phillips's residence and must have used Northwest's databases to locate the address. She gave Nussbaum Phillips's address, the license plate

5

number of Phillips's car, and her telephone number. Nussbaum called the Pennsylvania State Police and asked them to determine whether a search from Northwest had been run on Phillips's address.

Ferdebar also called Michalski and told him that she had gotten him fired from Northwest. She and Phillips then drove (in Phillips's car) to Lawrenceville, Pennsylvania and had lunch with her father. Afterward, she and Phillips drove to her house in Shaler. Meanwhile, Michalski went to Northwest and confirmed to Nussbaum that he had run a second unauthorized search to ascertain Phillips's address. Nussbaum told Michalski that he had no choice but to terminate his employment, though he would allow Michalski to resign. Michalski told Nussbaum that his "life was over" and that "Gretchen had ruined it." App. 222. Nussbaum testified at his deposition that he did not know that Michalski had received assistance from Tush and Craig the previous evening.

Upon leaving Northwest, Michalski purchased a firearm and ammunition, and proceeded to Ferderbar's house in Shaler after speaking with her on the phone. When he arrived, he shot and killed Ferderbar, her sister, and Mark Phillips. He was apprehended soon thereafter, and ultimately pleaded guilty to three counts of first-degree murder.

Acting on behalf of herself and her son Mark's estate, Jeanne Phillips brought this § 1983 action against Northwest, seven of its employees, the County of Allegheny, and Allegheny 911. She asserted claims under the Fourth and Fourteenth Amendments to the United States Constitution, as well as related tort claims under Pennsylvania law. The

6

District Court granted the defendants' motion to dismiss, and Phillips appealed. In

Phillips I, we affirmed the dismissal of claims asserted against four Northwest employees,

but reversed in other respects, leaving intact claims asserted against Northwest,

Nussbaum, Tush, Craig, the County of Allegheny, and Allegheny 911.

Phillips filed an amended complaint upon remand and discovery ensued. The

District Court thereafter granted summary judgment on the claims implicated here: (1) a

substantive due process claim against Tush and Craig; (2) an equal protection claim

against Northwest, Nussbaum, Tush, and Craig; and (3) state-law claims against

Northwest, Nussbaum, Tush, and Craig.[2] This timely appeal followed.[3]

## II.

Title 42 U.S.C. § 1983 provides a private right of action for any person whose

constitutional rights are deprived by state officials acting under the color of state law.

Section 1983 "is not itself a source of substantive rights, but a method for vindicating

federal rights elsewhere conferred . . . ." Baker v. McCollan, 443 U.S. 137, 145 n.3

---

[2] In earlier orders, the District Court: (1) dismissed the Fourth Amendment claim in its entirety and certain aspects of the Fourteenth Amendment claims; and (2) granted the unopposed motions for summary judgment filed by the County of Allegheny and Allegheny 911. Phillips has not appealed these orders.

[3] The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1367. We exercise jurisdiction pursuant to 28 U.S.C. § 1291, and our review is plenary. Kossler v. Crisanti, 564 F.3d 181, 186 (3d Cir. 2009) (en banc). Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Id. We must view the facts and evidence in the light most favorable to, and draw all reasonable inferences in favor of, Phillips, the non-moving party. Id.

7

(1979).  Accordingly, we ask whether the defendants deprived Mark Phillips of a constitutional right.  Id. at 140.  We conclude that they did not.

A.

The Fourteenth Amendment's Due Process Clause admonishes that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ."  U.S. Const. amend. XIV, § 1.  The Clause contains a "substantive component . . . that protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.'"  Collins v. City of Harker Heights, 503 U.S. 115, 125 (1992) (quoting Daniels v. Williams, 474 U.S. 327, 331 (1986)).  Phillips argues that Tush and Craig deprived her son Mark of this substantive guarantee under the so-called "state-created danger" theory, because they had direct knowledge that Michalski's erratic behavior would result in the injury ultimately inflicted, and because their assistance to Michalski directly facilitated Mark's murder.

A plaintiff must prove four elements to establish a state-created danger claim:  (1) the harm ultimately caused was foreseeable and fairly direct; (2) the state actor acted with a degree of culpability that shocks the conscience; (3) there was some relationship between the state and the injured party such that the plaintiff was a foreseeable victim of the defendant's acts; and (4) the state actor used his authority to create an opportunity for danger that otherwise would not have existed.  Walter v. Pike County, 544 F.3d 182, 192 (3d Cir. 2008); Kneipp v. Tedder, 95 F.3d 1199, 1208 (3d Cir. 1996).  The District Court

8

held that Phillips could not meet the first, third, and fourth elements of this test. We agree that the evidence does not support the first element of the claim, and therefore we need not address the others.[4]

We explained in Phillips I that a plaintiff adequately pleads the element of foreseeable harm by alleging "an awareness on the part of the state actors that rises to [the] level of actual knowledge or an awareness of risk that is sufficiently concrete to put the actors on notice of the harm." 515 F.3d at 238 (emphasis added). In addition to highlighting their awareness of Michalski's volatile personality and his relationship problems with Ferderbar, Phillips's original complaint alleged that when Michalski spoke to Tush and Craig, he specifically "requested information that would assist [him] in locating [Mark] Phillips." Id. Further, the complaint alleged that Michalski told Tush and Craig directly "that he 'had nothing left to live for' and that Ferderbar and Mark Phillips 'were going to pay for putting him in his present situation.'" Id. These allegations, we reasoned, were sufficient – indeed critical – either to "ma[ke] Tush and Craig actually aware of the risk to Mark Phillips," or to "put[ them] on notice that their actions in giving Michalski the unauthorized information about . . . Phillips significantly increased the risk of harm to him." Id. at 238-39. As we later made clear, however,

---

[4] The District Court reviewed much of what follows under the third element of the state-created danger framework. Though we believe that the defendants' lack of information concerning Michalski's purpose in seeking directions to 633 Edward Drive goes centrally to the foreseeability of the harm inflicted (rather than the identity of the victim), the basic reasoning employed by the District Court is correct.

9

"[s]tandards of pleading are not the same as standards of proof."  Id. at 246.

These core allegations underscoring our holding in Phillips I have not been substantiated.  Viewing the facts and evidence in the light most favorable to the plaintiff, several inferences are certainly available to support her claims.  Most saliently:  (1) Tush and Craig knew of Michalski's volatility and his mounting distress over his relationship with Ferderbar; (2) they were aware that on October 12, Michalski had run an unauthorized search on his own name, and that the search might have involved Ferderbar; (3) they knew that Michalski believed Ferderbar had begun dating another man; (4) they were aware that Michalski and another man whom Ferderbar had been seeing had a physical altercation on October 18; and (5) that Michalski in fact sought Phillips's address with an intent ultimately to injure Ferderbar and possibly her new companion.

Critically absent, however, is any evidentiary or logical nexus between Michalski's purpose in seeking directions to 633 Edward Drive and the dispatchers' knowledge of that purpose when they provided the directions to him.  Further, no evidence reasonably supports an inference that Tush and Craig knew the identity of Phillips or the relevance of 633 Edwards Drive.  Unless Tush and Craig knew or had good reason to know why Michalski sought directions to 633 Edward Drive, however, they had no "sufficiently concrete information about the risk of violence" that Michalski posed at that time – to Phillips or anyone else.  Phillips I, 515 F.3d at 238.

We hold that neither "ordinary common sense and experience," id. at 237

10

(discussing Kneipp, 95 F.3d at 1208), nor particularized "expertise," id. at 238

(discussing Rivas v. City of Passaic, 365 F.3d 181, 194 (3d Cir. 2004)), should have led

Tush or Craig to believe that Michalski had obtained the address through a second

unauthorized database search, that the address belonged to Ferderbar's new boyfriend, or

that Michalski intended ultimately to cause bodily injury to the occupants of that address.

Consequently, we reject the plaintiff's argument that a "jury could conclude [that Tush

and Craig] assisted [Michalski] with knowledge that Michalski wanted the [directions] to

harm a romantic rival." Phillips Br. at 30. That proposition is purely speculative.[5]

The information available to Tush and Craig at the time they spoke to Michalski –

even when taken into account with their background knowledge of Michalski's

aggressive propensities and his virulent relationship with Ferderbar – is not of the sort

that we have found to signal a concrete risk of harm. See Rivas, 365 F.3d at 194-95

(holding that it was foreseeable to EMTs that failing to inform police officers not to

_____

[5] Phillips emphasizes Tush's contemporaneous comment that she "probably [had just] aided and abetted some sort of felony," and the fact that Craig spoke with Michalski for seven minutes on an unrecorded telephone line after Michalski refused to detail his objectives on a recorded line. These facts, she says, support a reasonable inference that Tush and Craig must have known that their assistance would result in harm to Ferderbar's new love interest. We disagree. Even if Tush's offhand comment proves more than that she thought Michalski was "just . . . going to do one of his stupid little things that he always did," App. 309, it does nothing to show that Tush should have known that Michalski intended to inflict bodily harm on anyone, let alone on Phillips specifically or Ferderbar's new boyfriend more generally. And it is bald speculation to convert Craig's unrecorded telephone conversation with Michalski into an inference that Michalski told Craig that he intended to inflict harm upon the occupants of 633 Edward Drive.

11

restrain seizure victim would result in harm); Estate of Smith v. Marasco, 318 F.3d 497, 507-08 (3d Cir. 2003) (holding that injury was foreseeable where officers attempted to draw barricaded occupant from a house, and where the officers were aware of occupant's stress-sensitive heart condition); Kneipp, 95 F.3d at 1208 (holding that it was foreseeable to police officer that leaving severely inebriated woman alone to walk home would result in injury). Instead, we think this case is more analogous to Morse v. Lower Merion School District, where we held that a daycare center "could not have foreseen that allowing construction workers to use an unlocked back entrance for access to [a] school building would result in the murderous act of a mentally unstable third party . . . ." 132 F.3d 902, 908 (3d Cir. 1997).

We conclude that no evidence reasonably supports an inference that Tush and Craig knew or had reason to know that they were providing Michalski access to Ferderbar's new boyfriend's address, as opposed to the location of an infinite number of alternative and innocuous destinations. Consequently, we hold, the harm visited upon Mark Phillips was not reasonably foreseeable to them. We will affirm the District Court's summary judgment on Phillips's substantive due process claim.

B.

The Fourteenth Amendment's Equal Protection Clause admonishes that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Phillips argues that Northwest, Nussbaum, Tush, and Craig

12

intentionally discriminated against her son, thus depriving him of his right to equal protection. She asserts this claim under the "class of one" theory of equal protection jurisprudence. See Vill. of Willowbrook v. Olech, 528 U.S. 562 (2000). "[T]o state a claim under th[e class of one] theory, a plaintiff must allege that (1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment." Hill v. Borough of Kutztown, 455 F.3d 225, 239 (3d Cir. 2006). The District Court concluded that Phillips could not satisfy the first and second elements of a class of one claim. We agree that the second element cannot be met, and therefore we need not address the first.

Our substantive due process analysis above compels us to reject Phillips's equal protection claim as it respects Tush and Craig. Without evidence supporting a justifiable inference that Tush and Craig knew or had reason to know of (1) Mark Phillips's identity, or (2) Michalski's purpose in seeking the directions to 633 Edward Drive, they necessarily could not have intentionally discriminated against him by assisting Michalski.[6]

Nor does the available evidence reasonably suggest that Nussbaum intentionally

_____

[6] Phillips argues that Tush's failure to inform an officer investigating the murders that she had spoken to Michalski the previous evening supports an inference that she had acted intentionally the previous evening. Phillips Br. at 31-32. We disagree. Cf. Morse, 132 F.3d at 910 ("Defendants could not have been aware of the danger posed by [the perpetrator], nor could they have foreseen it. As a matter of law they cannot have acted with willful disregard for [the plaintiff's] safety.").

discriminated against Phillips when he allegedly: (1) failed to restrict or monitor Michalski's search activity; and (2) failed to take affirmative steps to protect Phillips after Michalski's employment had been terminated.

Phillips argues that the evidence permits the inference that Nussbaum had knowledge that Michalski's first unauthorized database search stemmed from his relationship struggles with Ferderbar. From there, she posits that a jury reasonably could find that Nussbaum was aware of Michalski's altercation with the man whom Ferderbar had been seeing. Accordingly, she argues that Nussbaum must have been aware that such an individual "was at risk of having his information compromised by Michalski." Phillips Br. at 24-25. These inferences, Phillips says, are such that "[a] reasonable jury could conclude that . . . Nussbaum's failure to react to the mounting information that Michalski's actions involved harming a rival . . . was based not on ignorance of Michalski's purpose, but rather a knowing, deliberate indifference to it." Id. at 25.

We disagree. We grant Phillips all favorable inferences with respect to: (1) Nussbaum's knowledge of Michalski's volatile disposition; (2) Nussbaum's knowledge of Michalski's relationship with Ferderbar and his prior physical altercation with Ferderbar's new companion; (3) Nussbaum's knowledge of Michalski's mental state during the relevant periods; (4) Nussbaum's awareness that Michalski's first unauthorized search concerned his relationship with Ferderbar; and (5) Nussbaum's knowledge that – after receiving Phillips's information from Ferderbar and hearing Michalski say that his

14

"life was over" and that "Gretchen had ruined it" – Michalski posed a risk to both Ferderbar and Phillips.

But none of these inferences – and none of the other available evidence – does anything to show that Nussbaum's failures to act were <u>intentional</u> efforts to single out Michalski's ex-girlfriend's new boyfriend for differential treatment. Such a conclusion requires a logical leap unsupported by any evidence the plaintiff has proffered. Accordingly, we reject as a matter of law Phillips's argument that Nussbaum's conduct reasonably can be extrapolated to equate to intentional discrimination. Rather, we conclude that Nussbaum's conduct can be characterized – at most – as a negligent or reckless failure to take protective action. This does not suffice to establish a cognizable class of one claim.[7] We will affirm the District Court's judgment with respect to the equal protection claim.

## III.

Phillips also asserts wrongful death and survival claims under Pennsylvania law

----

[7] Having concluded that no Northwest employee infringed Mark Phillips's right to equal protection, the claim that Northwest is vicariously liable – under <u>Monell v. Department of Social Services of the City of New York</u>, 436 U.S. 658 (1978) – necessarily fails as well. <u>See</u> <u>Grazier v. City of Phila.</u>, 328 F.3d 120, 124 (3d Cir. 2003) ("There cannot be an 'award of damages against a municipal corporation based on the actions of . . . its officers when in fact . . . the officer[s] inflicted no constitutional harm.'" (quoting <u>City of Los Angeles v. Heller</u>, 475 U.S. 796, 799 (1986) (per curiam))); <u>see also</u> <u>Sanders v. City of Minneapolis</u>, 474 F.3d 523, 527 (8th Cir. 2007) ("Without a constitutional violation by the individual officers, there can be no § 1983 or <u>Monell</u> . . . liability.").

15

against Northwest, Nussbaum, Tush, and Craig. The District Court held that the evidence does not support two necessary elements – duty and proximate causation. Our examination of the record convinces us that the District Court's analysis was correct. We will therefore affirm the judgment on these claims without further discussion.

## IV.

For the foregoing reasons, the judgment will be affirmed.